**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*, ANNE MELISSA DOWLING, ACTING DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, as Rehabilitator for TRIAD GUARANTY INSURANCE CORPORATION and TRIAD GUARANTY ASSURANCE CORPORATION, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| | ) | Honorable _____ |
| AAMBG REINSURANCE, INC., a Vermont corporation, | ) ) ) | |
| Defendant. | ) ) | |

**NOTICE OF REMOVAL**

Defendant AAMBG Reinsurance, Inc. ("AAMBG") hereby removes the above-captioned proceeding to the United States District Court for the Northern District of Illinois, Eastern Division. Removal is based on 28 U.S.C. §§ 1331, 1332, 1367, 1441, and 1446.[1]

As grounds for removal, AAMBG states the following:

**I.    BACKGROUND**

1.    On December 11, 2012, the Circuit Court of Cook County, Illinois, Chancery Division, designated Andrew Boron, the then-Director of Insurance of the State of Illinois, as the Rehabilitator of estates holding the liabilities and assets of two Illinois stock insurance companies: Triad Guaranty Insurance Corporation ("TGIC") and Triad Guaranty Assurance

---

[1]    The caption of the Complaint at Law and for Injunctive Relief ("Complaint," **Exhibit 1** hereto) that AAMBG removes to this Court appears to relate to the underlying Rehabilitation matter in state court rather than the present action. For example, the caption identifies Triad Guaranty Insurance Corporation and Triad Guaranty Assurance Corporation as "defendants" rather than as plaintiffs and instead of listing AAMBG Reinsurance, Inc. as the defendant. For clarity, a corrected caption is used for this Notice of Removal.

Corporation ("TGAC"). *See* Complaint, **Exhibit 1** hereto, at Ex.1, pp. 1-2. Mr. Boron thus was "stand[ing] in the shoes of the insolvent compan[ies]." *Shapo v. Underwriters Mgmt. Corp.*, No. 98 C 4084, 2002 WL 31155059, at *7 (N.D. Ill. Sept. 27, 2002). Sometime later, Anne Melissa Dowling replaced Mr. Boron as Acting Director of Insurance of the State of Illinois. *See* "About the Illinois Department of Insurance," http://insurance.illinois.gov/main/about.asp.

2. On or about June 17, 2016, Ms. Dowling, in her capacity as Acting Director of Insurance of the State of Illinois and Rehabilitator of the estates of TGIC and TGAC filed the Complaint (**Exhibit 1** hereto) in the Circuit Court of Cook County, Illinois, Chancery Division, against AAMBG. Accordingly, TGIC and TGAC, as the real plaintiffs in interest, are referred to as "Plaintiffs" herein.

3. According to the Complaint, TGIC and AAMBG entered into a Reinsurance Agreement (*id.* ¶ 6, Ex. 2), pursuant to which AAMBG acted as reinsurer for mortgage insurance policies that TGIC issued on loans originated by certain "Captive Lenders" of which AAMBG is an alleged subsidiary (*id.* ¶¶ 4, 7). The Complaint alleges that the Captive Lenders only referred borrowers with a high risk of default to TGIC for mortgage insurance in order to maximize AAMBG's and its Captive Lenders' profits. *Id.* ¶¶ 9, 43-44. Plaintiffs also allege that, pursuant a Trust Agreement between TGIC and AAMBG (*id.* ¶ 10, Ex. 3), reinsurance premiums were placed into a trust, invested, and utilized to fund claim payments due under the Reinsurance Agreement (*id.* ¶¶ 10-11). Plaintiffs further allege that "dividends" were issued from the trust to reinsurers on a quarterly basis "for the benefit of the Captive Lenders" (*id.* ¶ 12), which allegedly constituted the payment of kickbacks "in exchange for the referral of private mortgage insurance business from the lenders" in violation of RESPA (*id.* ¶¶ 15-16, 22, 33-37). The Complaint alleges that AAMBG and the "Captive Lenders" did not provide adequate disclosures to borrowers of benefits they were receiving under this kickback scheme, which also violated

RESPA. *Id.* ¶¶ 13-14, 39-41. Plaintiffs state that the balance of the trust account is currently $10,474,234. *Id.* ¶ 12.

4. The Complaint asserts three counts against AAMBG: "Breach of Contract" based on alleged violations of RESPA by purportedly receiving and failing to disclose kickbacks (Count I), "Breach of Contract – breach of the implied covenant of good faith and fair dealing" (Count II), and "Declaratory Judgment and Injunctive Relief" based on the same alleged RESPA violations (Count III). Accordingly, Plaintiffs' entire lawsuit is based on the central theory that AAMBG violated Section 8 of RESPA, 12 U.S.C. § 2607(b), when it accepted from TGIC "a portion, split, or percentage of charges received by [TGIC] for the rendering of business incident to a real estate settlement service other than for services actually performed." *Id.* ¶ 37.

5. AAMBG first received a copy of the Complaint by U.S. Mail on June 23, 2016, and executed a Notice and Acknowledgment of Receipt of Summons and Complaint on July 20, 2016 (**Exhibit 2** hereto).

## II.   CITIZENSHIP OF THE PARTIES

6. Plaintiffs TGIC and TGAC are both alleged to be Illinois stock insurance companies.

7. AAMBG is a Vermont corporation with its principal place of business in Vermont, and thus is not a citizen of Illinois.

## III.   FEDERAL QUESTION JURISDICTION EXISTS UNDER 28 U.S.C. § 1331

8. Pursuant to 28 U.S.C. § 1331, the Court has original jurisdiction of civil actions arising under the laws of the United States. 28 U.S.C. § 1331.

9. In Count III, Plaintiffs bring a cause of action against AAMBG that "arises under" Section 8 of RESPA, 12 U.S.C. § 2607(b) (see *supra* at ¶¶ 3-4), in that they seek a declaration that federal law—RESPA—has been violated. Accordingly, the Court has federal question

jurisdiction. 28 U.S.C. § 1331; *Bolden v. Wells Fargo Bank, N.A.*, No. 14 C 403, 2014 WL 6461690, at *5 (N.D. Ill. Nov. 18, 2014) (even when the complaint does not clearly set forth the basis for jurisdiction, the presence of a RESPA claim provides the court with federal question jurisdiction); *Konieczka v. Wachova Mortg. Corp.*, No. 11 C 0071, 2012 WL 1049910, at *6 (N.D. Ill. Mar. 28, 2012) (RESPA claim provides federal question jurisdiction). Like Count III, Count I "arises under" RESPA Section 8, as it is based on the exact same alleged kickback arrangement and failure to disclose kickbacks as is Count III.[2] Plaintiffs' request for relief also demonstrates that the claims "arise under" RESPA:

- Plaintiff brings claims … for a declaration that the payment of funds and dividends to AAMBG is an illegal kickback under RESPA and this provision of the Reinsurance Agreement is void  (*id.* ¶ 1);

- The Court, in the exercise of its equitable power, may award ancillary relief, including rescission/modification of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of Section 8 of RESPA (*id.* ¶ 52);

- Sections 8 and 16 of RESPA, 12 U.S.C. §§ 2607(d)(1) and (5), empowers this Court to award civil money penalties, payment of damages or other monetary relief, and the Director's costs of prosecuting this action, in addition to the equitable remedies described above (*id.* ¶ 53); and

- Plaintiff requests that this Court enter judgment in its favor and against AAMBG, find that the payments of dividends from the Trust Account to AAMBG and its affiliated Captive Lenders violates RESPA and public policy, find that the portions of the Agreement that provide from [*sic*] the payment of dividends from the Trust Account to AAMBG and its affiliated Captive Lenders is void as they are violative of the law, declare that the Trust Account is the property of the estate and no other party, award attorney's fees and costs, and for any other relief that this Court deems necessary and just (*id.* at pp. 6-7).

---

[2]     Despite its reliance on allegations that are not particularly clear, Count II likewise appears to be premised on a violation of Section 8 of RESPA insofar as it accuses AAMBG of selecting business referrals in the real estate settlement service context in a manner designed to maximize the benefits AAMBG and its Captive Lenders received. *See* Compl. ¶¶ 9, 43-44. Even if federal question jurisdiction did not exist over this claim, supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367. *Bolden*, 2014 WL 6461690, at *5 (exercise of supplemental jurisdiction over state law claims is appropriate if the court has federal question jurisdiction of RESPA claim); *Goode v. PennyMac Loan Services, LLC*, No. 14 C 01900, 2014 WL 6461689, at *1 n.2 (N.D. Ill. Nov. 18, 2014) (same).

Indeed, the Complaint contains an entire section titled "Violations of RESPA." *Id.* ¶¶ 25-37.

10.     Plaintiffs' attempt to label their causes of action under state law does not defeat federal jurisdiction because the Complaint "necessarily raise[s] a stated federal issue, actually disputed and substantial, which [the Court] may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Evergreen Sq. of Cudahy v. Wisc. Housing & Econ. Dev'mt Auth.*, 776 F.3d 463, 466 (7th Cir. 2015), *quoting Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfr'g*, 545 U.S. 308, 314 (2005) (holding that court had federal question jurisdiction in action involving only state law breach of contract claims that necessitated construction and application of federal law and regulations); *see also NewPage Wisc. Sys., Inc. v. United Steel Workers*, 651 F.3d 775, 778 (7th Cir. 2011) (holding that court had federal question jurisdiction in action seeking declaratory judgment that required court to construe federal statutory scheme to determine whether party had breached contract).  In the Complaint, Plaintiffs repeatedly allege that AAMBG violated RESPA (*see* ¶¶ 1, 15-16, 25-37, 41, 47-53), bring Counts I and III (and possibly also II) based on RESPA violations (*id.* at pp. 5-7), and seek relief that is only available under RESPA and not under the state law claims (*e.g.*, injunctive relief, voiding contractual provisions, and declaring that RESPA violations have occurred and that the trust account is the property of Plaintiffs' estates) (*id.* at 6-7).

## IV.     DIVERSITY JURISDICTION EXISTS UNDER 28 U.S.C. § 1332

11.     In addition to federal question jurisdiction, diversity jurisdiction exists because this matter in controversy exceeds $75,000 and is between citizens of different States.  28 U.S.C. § 1332(a)(1).

*12.*     Citizenship of the Parties.  The requisite complete diversity of citizenship exists under 28 U.S.C. § 1332(a)(1).  Plaintiffs TGIC and TGAC are both alleged to be citizens of Illinois.  By contrast, AAMBG is not a citizen of Illinois.

5

13. <u>Amount in Controversy</u>. There is more than $75,000 in controversy in this action, as required for the Court to exercise diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). While AAMBG denies that Plaintiffs are entitled to recover any amount, and specifically denies that Plaintiffs are entitled to relief in the various forms sought, Plaintiffs' relief sought as alleged in the Complaint places an aggregate amount in controversy of more than $10,000,000, exclusive of interest and costs. *See*, *e.g.*, Compl. ¶¶ 12 and 16.

## V.    **PROCEDURAL REQUIREMENTS**

14. <u>Removal Is Timely</u>. This Notice of Removal has been filed timely within thirty days of AAMBG's receipt by U.S. Mail of a copy of the Complaint and waiver of service request on June 23, 2016. 28 U.S.C. § 1446(b)(1).

15. <u>Removal to Proper Court</u>. The Circuit Court of Cook County is located within the Northern District of Illinois, Eastern Division. 28 U.S.C. § 93(a)(1). This Notice of Removal is therefore properly filed in this Court, pursuant to 28 U.S.C. § 1441(a).

16. <u>Pleadings and Process</u>. Attached hereto as **<u>Exhibits 1, 2, and 3</u>**, respectively, are copies of the Complaint, Notice and Acknowledgment of Receipt of Summons and Complaint, and Summons, which are all of the process, pleadings, and orders served on AAMBG in the state court action. 28 U.S.C. § 1446(a).[3]

17. <u>Notice</u>. A copy of the Notice of Filing of Notice of Removal will be timely filed with the clerk of the state court in which the action is pending and served on Plaintiff's counsel

---

[3]    It remains unclear to AAMBG the precise date on which the Complaint was filed with the Circuit Court of Cook County because the Clerk of Court's date stamp on the face of the Complaint is illegible other than indicating that it was filed during the year 2016, and the date stamp on the face of the Summons is illegible other than indicating that it was filed during the month of June 2016. The caption of the Complaint reflects the case number 12 CH 43895, which would normally indicate that a proceeding was commenced during the year 2012. Also, as noted above, the caption appears to relate to the underlying Rehabilitation action rather than the present action against AAMBG. If the Court requires any additional information from the state court action beyond the information attached hereto as exhibits, which is all that must be attached pursuant to 28 U.S.C. § 1446(a), AAMBG will undertake to provide that information forthwith.

pursuant to 28 U.S.C. § 1446(d) (**Exhibit 4** hereto).  A copy of the Notice of Removal to All Adverse Parties will be served promptly on Plaintiff's counsel, pursuant to 28 U.S.C. §§ 1446(a), (d) (**Exhibit 5** hereto).

18.    Consent.  Pursuant to 28 U.S.C. § 1446(b)(2)(A), "all defendants who have been properly joined and served must join in or consent to the removal of the action" *only where* the "action is removed solely under section 1441(a)."  Here, AAMBG removes this action pursuant to *both* 28 U.S.C. § 1441(a) *and* 28 U.S.C. § 1441(b), so the consent requirement does not apply. And, AAMBG is the sole defendant in this case, so no other consent is necessary.

19.    Signature.  This Notice of Removal is signed pursuant to Federal Rule of Civil Procedure 11.  28 U.S.C. § 1446(a).

20.    Bond and Verification.  Pursuant to Section 1016 of the Judicial Improvements and Access to Justice Act of 1988, no bond is required in connection with this Notice of Removal.  Pursuant to Section 1016 of the Act, this Notice need not be verified.

21.    Based upon the foregoing, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1367, and this action therefore may be removed to this Court under 28 U.S.C. §§ 1441 and 1446.

22.    In the event that Plaintiffs seek to remand this case, or the Court considers remand *sua sponte*, AAMBG respectfully requests the opportunity to submit such additional briefing, argument, and/or evidence in support of removal as may be necessary.

WHEREFORE, defendant AAMBG Reinsurance, Inc. respectfully removes this action to the United States District Court for the Northern District of Illinois, Eastern Division.

Dated:  July 22, 2016

RESPECTFULLY SUBMITTED,

By  /s/ Thomas V. Panoff
     Lucia Nale
     Thomas V. Panoff
     Joseph M. Callaghan
     MAYER BROWN LLP
     71 South Wacker Drive
     Chicago, Illinois  60606-4637
     Telephone: (312) 782-0600
     Facsimile:  (312) 701-7711
     lnale@mayerbrown.com
     tpanoff@mayerbrown.com
     jcallaghan@mayerbrown.com

     David M. Souders
     (*pro hac vice* motion forthcoming)
     WEINER BRODSKY KIDER PC
     1300 19th Street, N.W., Fifth Floor
     Washington, D.C. 20036
     Telephone:  (202) 628-2000
     Facsimile:  (202) 628-2011
     souders@thewbkfirm.com

     *Counsel for Defendant AAMBG*
     *Reinsurance, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 22, 2016, a true and correct copy of the foregoing

**NOTICE OF REMOVAL** was electronically filed with the Clerk of the Court of the United

States District Court for the Northern District of Illinois using the Court's CM/ECF system,

which will send a notice of electronic filing to all counsel of record, and that the foregoing also

was sent via first-class U.S. Mail to:

Dominick L. Lanzito
PETERSON, JOHNSON & MURRAY
200 W. Adams, Suite 2125
Chicago, IL 60606


/s/ Joseph M. Callaghan
Joseph M. Callaghan

# EXHIBIT 1

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT CHANCERY DIVISION

PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*,
ANDREW BORON, DIRECTOR OF INSURANCE OF
THE STATE OF ILLINOIS,

Plaintiffs,

v.

TRIAD GUARANTY INSURANCE CORPORATION,
an Illinois domestic stock insurance company, and
TRIAD GUARANTY ASSURANCE
CORPORATION,
an Illinois domestic stock insurance company,

Defendants.

Case No. 12 CH 43895

### PLAINTIFFS COMPLAINT AT LAW AND FOR INJUNCTIVE RELIEF

Now Comes PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*, ANDREW BORON,

DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS ("Rehabilitator"), by and through

his attorneys, Peterson, Johnson & Murray Chicago LLC and Complains of Defendants as follows:

### Jurisdiction and Venue

1.     This Complaint is filed pursuant to the authority of the Rehabilitator to bring claims that
are part of the estate of TRIAD GUARANTY INSURANCE CORPORATION, an Illinois
Domestic stock insurance company ("Triad"), and TRIAD GUARANTY ASSURANCE
CORPORATION, an Illinois domestic stock insurance company ("TGAC"). Plaintiff brings
claims for breach of contract and for a declaration that the payment of funds and dividends to
AAMBG is an illegal kickback under RESPA and this provision of the Reinsurance Agreement is
void.

2.     This Court has jurisdiction over all claims involving the assets in the Estate of Triad and
TGAC. Venue is property in the Circuit Court of Cook County pursuant to 215 ILCS 5/188 and
735 ILCS 5/2-101.

### Parties

3.     On December 12, 2012, PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*, ANDREW
BORON, DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS ("Rehabilitator") was
appointed as Rehabilitator over TRIAD GUARANTY INSURANCE CORPORATION, an Illinois
domestic stock insurance company ("Triad'), and TRIAD GUARANTY ASSURANCE
CORPORATION, an Illinois domestic stock insurance company ("TGAC"). (Ex. 1, Order of

Rehabilitation) Pursuant to the Order of Rehabilitation, the Rehabilitator "is authorized to deal with the property, business and affairs of Triad and TGAC in the name of Triad and TGAC, as applicable." *Id*. at E(iv).

4.     AAMBG Reinsurance Corporation – Interfirst - is a Vermont corporation, with its corporate offices located in Burlington, Vermont, who at all times relevant hereto, entered into a Reinsurance Agreement ("Agreement") (attached as Exhibit 2 hereto and engaged in the business of selling private mortgage reinsurance and ceded premiums to lenders in exchange for purported "reinsurance." AAMBG was a subsidiary of one or more of the Captive Lenders identified in Paragraph 5.

5.     Under the terms of the Agreement, AAMBG required Triad and TGAC to use captive lenders that were AAMBG's affiliates. At the time of the Agreement, those affiliates included Standard Federal Bank, ABN Amro Mortgage Group, Inc., and LaSalle Home Mortgage Corp.

**Facts**

6.     On or about June 8, 1999, Triad Guaranty Insurance Corporation entered into a Reinsurance Agreement. (Exhibit 2).

7.     Under the terms of the Agreement, AAMBG was a reinsurer for mortgage insurance policies that Triad issued on a loan originated by one of the Approved Originators. The Approved Originators are also referred to in the lending industry as Captive Lenders.

8.     The Captive Lenders would contact Triad to provide mortgage insurance to their borrowers and in turn, AAMBG would provide reinsurance for said mortgage insurance policy.

9.     The Captive Lenders chose which loans to seek mortgage insurance coverage through Triad. On information and belief, AAMBG and its affiliates, and captive lenders only selected the mortgages that presented the highest risk of default to Triad for mortgage insurance, while providing mortgage insurance through other entities on loans that presented a lower risk of default.

10.     The premiums for the mortgage reinsurance were placed into a trust pursuant to a trust agreement between Triad and AAMBG. (Exhibit 3)

11.     The funds in the trust were then invested and were utilized to fund any payments that became due under the terms of the mortgage reinsurance agreement.

12.     On a quarterly basis, to the extent that the trust was fully funded, as set forth in the terms of the Agreement and the Trust Agreement, dividends would be issued to the reinsurer and for the benefit of the Captive Lenders. There remains a balance in this Trust Account of approximately $10,474,234.00 as of the date of filing of this Complaint.

13.     Pursuant to the terms of the Agreement and as otherwise required by law, the Captive Lenders were to disclose the existence of this remittance and the benefit it derived from the mortgage reinsurance premiums to its borrowers.

14.     On information and belief, the Captive Lenders failed to disclose existence of this remittance and the benefit it derived from the mortgage reinsurance premiums to its borrowers.

15.     Section 8 of RESPA prohibits: (1) the payment and acceptance of any fee, kickback, or thing of value in exchange for referring a consumer to a real estate settlement service provider, and (2) the giving or accepting of any portion, split, or percentage of a charge for a real estate settlement service other than for services actually performed (that is, unearned fees).

16.     This Action is brought to seek a declaration that the funds in the Trust Account should be deemed the assets of this Estate, that AAMBG breached the Agreement when it failed to properly disclose its acceptance of unearned fees vis-à-vis its affiliated Captive Lenders which were disguised as dividends on reinsurance premiums, were paid by Triad to the Captive Lenders i.e., entities offering or providing residential mortgage loans ("lenders"), in exchange for the referral of private mortgage insurance business from the lenders.

## FACTS

### General Averments regarding Private Mortgage Insurance

17.     Private mortgage insurance is issued by a mortgage insurance provider. Typically, the lender selects and designates the mortgage insurance provider that will provide the mortgage insurance at the time of the loan origination. As a result, consumers usually have no effective choice in this referral.

18.     In the event of a borrower default, the mortgage insurance policy covers a specified percentage of losses the lender may face in connection with a foreclosure of the loan.

19.     Prior to the 2008 financial crisis, mortgage insurance was a very profitable business for Defendant. As a result, Triad and TGAC highly valued their selection by lenders to provide mortgage insurance for loan transactions originated by the lenders.

20.     Beginning in the mid-1990's, many lenders established their own wholly-owned subsidiaries to serve as captive reinsurers providing purported reinsurance to Triad and TGAC and others. These captive reinsurers purported to provide a layer of reinsurance coverage primarily or exclusively for the mortgage insurance on the affiliated lender's mortgage loans.

21.     As alleged, Triad entered into captive mortgage reinsurance arrangements ("captive arrangements") with AAMBG. Under each of these arrangements, Triad agreed to cede a certain percentage of a referred borrower's mortgage insurance premiums back to the referring lender through the captive lender's wholly-owned subsidiary, the captive reinsurer, purportedly in exchange for reinsurance coverage.

### Unearned Fees to Captive Lenders

22.     Triad's reinsurance premiums and dividends from the Trust Account ceded to AAMBG were unearned kickback payments, paid in exchange for referring customers from the captive lenders.

23.     The reinsurance provided by the AAMBG was of little if any value because the projected value of the reinsurance to Triad was far less than the premiums Defendant expected to cede.

24.     Ceding a percentage of mortgage insurance premiums and dividends from the Trust Account to AAMBG's designated captive lenders and affiliates through the Agreement encouraged the affiliated captive lenders to refer mortgage insurance business to Triad.

## VIOLATIONS OF RESPA

25      Section 8(a) of RESPA prohibits any person from giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).

26.     Section 8(b) of RESPA prohibits the giving and acceptance of "any portion, split, or percentage" of any charge made or received for a settlement service other than for services actually performed in connection with a transaction involving a federally related mortgage loan. 12 U.S.C. § 2607(b).

27.     The affiliated Captive Lenders of AAMBG are providers of settlement services subject to the requirements of, and is a "person" under, Section 8 of RESPA. *See* 12 U.S.C. § 2602.

28.     Mortgage insurance constitutes "business incident to or a part of a real estate settlement service" within the meaning of Section 8 of RESPA. 12 C.F.R. § 1024.2(b).

29.     The home loans originated by lenders and referred to Defendant are "federally related mortgage loans" as defined in 12 U.S.C. § 2602(1) and 12 C.F.R. § 1024.2(b).

30.     In the course and conduct of making these home loans, the affiliated Captive Lenders routinely referred many consumers to Triad for mortgage insurance.

31.     These referrals of mortgage insurance business were made pursuant to the Agreements between Triad and AAMBG which provided that Triad would cede a portion of their mortgage insurance premiums to the referring captive lender's affiliated reinsurer.  These agreements were memorialized in the attached Reinsurance Agreement, Trust Agreement, other written communications between and within lenders and Triad.

32.     Each ceding payment and distribution of dividends from the Trust Account by Triad to AAMBG is a "thing of value" that has been given to the Captive Lender.

33.     Each such ceding payment and dividend payment from the Trust Account: (a) was not and is not for services actually furnished or performed by the reinsurer or Captive Lender, or (b) grossly exceeded or exceeds the value of any such services.

34.     Each such ceding payment and dividend payment from the Trust Account by Triad was made in consideration of the affiliated Captive Lenders' continued referral of mortgage insurance business to Triad.

35.     Each such ceding payment therefore was and is an illegal kickback in violation of Section 8(a) of RESPA, 12 U.S.C. § 2607(a), for which Triad is liable.

36.     Each ceding payment paid by Triad to AAMBG and accepted by the captive lender through its affiliation with AAMBG is a portion, split, or percentage of the private mortgage insurance premiums paid by consumers who are lenders' customers.

37.     Triad gave and AAMBG accepted for the benefit their affiliated Captive Lender a portion, split, or percentage of charges received by Triad for the rendering of business incident to a real estate settlement service other than for services actually performed, in violation of Section 8(b) of RESPA, 12 U.S.C. §2607(b), for which AAMBG is liable.

## Count I - Breach of Contract

38.     Plaintiff hereby restates and realleges paragraphs 1-34 as set forth fully herein.

36.     Plaintiff and AAMBG entered into a written contract for the purposes of providing reinsurance on private mortgage insurance policies issued by Triad.

39.     Pursuant to the terms of that Agreement, AAMBG and its affiliated Captive Lenders were to provide adequate disclosure of the benefits that they were receiving including the premiums and other financial kickbacks.

40.     AAMBG and its affiliated Captive Lenders failed to adequately provide disclosures to the borrowers at the time of closing of the benefits that they were receiving from Triad under the terms of the Agreement.

41.     AAMBG's and its affiliated Captive Lenders' breach if their duties under the Agreement also violate the requirements of RESPA.

40.     As a result of the breach of its contract, Plaintiff has suffered and will suffer damages of a pecuniary nature.

**WHEREFORE** Plaintiff requests that this Court enter judgment in its favor and against AAMBG, award attorney's fees and costs, and for any other relief that this Court deems necessary and just.

## Count II - Breach of Contract - breach of the implied covenant of good faith and fair dealing

41.     Plaintiff hereby restates and realleges paragraphs 1-34 as set forth fully herein.

42.     Pursuant to the terms of the Agreement Triad was to provide private mortgage insurance to AAMBG's affiliated captive lenders and in turn, AAMBG would provide reinsurance for the private mortgage insurance policies issued by Triad.

43.     Upon information and belief, the affiliated Captive Lenders and AAMBG vetted its borrowers and only referred the borrowers with the highest level of default risk to Triad for private mortgage insurance.

44.     The selective mortgage insurance referrals to Triad from AAMBG and its affiliated Captive Lenders enabled them to minimize their risk of reinsuring loans that could go into default, while maximizing profits for AAMBG and its affiliated Captive Lenders.

45.     The conduct of AAMBG and its affiliated Captive Lenders violated the implied covenant of good faith and fair dealing implied within the terms of the Agreement.

46.     As a result of the breach of its contract, Plaintiff has suffered and will suffer damages of a pecuniary nature.

       **WHEREFORE,** Plaintiff requests that this Court enter judgment in its favor and against AAMBG, award attorney's fees and costs, and for any other relief that this Court deems necessary and just.

## Count III-Declaratory Judgment and Injunctive Relief

47.     Plaintiff hereby restates and realleges paragraphs 1-34 as set forth fully herein.

48.     The RESPA and the Agreement required that any benefit provided to AAMBG and its affiliated Captive Lenders to disclosed to the borrower.

49.     The payment of reinsurance premiums and dividends from the Trust Account constitute a benefit to AAMBG and its affiliated Captive Lenders that had to be disclosed to the borrowers.

50.     Triad would have to violate the requirements of RESPA under the terms of the Agreement if Triad has to distribute funds and dividends from the Trust Account to AAMBG and its affiliated Captive Lenders because the borrowers were never notified of the benefits and kickbacks received by AAMBG and its affiliated Captive Lenders.

51.     Sections 8 and 16 of RESPA, 12 U.S.C. §§ 2607(d)(4) and 2614 empower this Court to grant injunctive relief to halt and redress violations of Section 8 of RESPA in actions brought by the Director of the Illinois Department of Insurance.

52.     The Court, in the exercise of its equitable power, may award ancillary relief, including rescission/modification of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of Section 8 of RESPA in actions brought by the Bureau.

53.     Further Sections 8 and 16 of RESPA, 12 U.S.C. §§ 2607(d)(1) and (5), empowers this Court to award civil money penalties, payment of damages or other monetary relief, and the Director's costs of prosecuting the action, in addition to the equitable remedies described above.

       **WHEREFORE,** Plaintiff requests that this Court enter judgment in its favor and against AAMBG, find that the payments of dividends from the Trust Account to AAMBG and its affiliated Captive Lenders violates RESPA and public policy, find that the portions of the Agreement that provide from the payment of dividends from the Trust Account to AAMBG and its affiliated Captive Lenders is void as they are violative of the law, declare that the Trust Account is the

property of the estate and no other party, award attorney's fees and costs, and for any other relief
that this Court deems necessary and just.

Respectfully submitted,

PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*,
ACTING DIRECTOR OF INSURANCE, ANNE
MELISSA DOWLING,

By: _____

One of Their Attorneys

Dominick L. Lanzito
Peterson, Johnson & Murray - Chicago LLC
200 West Adams - Ste. 2125
Chicago, Illinois 60606
(312) 782-7150
dlanzito@pjmlaw.com

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*, )
ANDREW BORON, DIRECTOR OF )
INSURANCE OF THE STATE OF ILLINOIS, )
  )
                  **Plaintiffs,** )
  )     NO. 12 CH 43895
    **v.** )
  )
TRIAD GUARANTY INSURANCE CORPORATION, )
an Illinois domestic stock insurance company, and )
TRIAD GUARANTY ASSURANCE CORPORATION, )
an Illinois domestic stock insurance company, )
  )
                **Defendants.** )

### ORDER OF REHABILITATION

THIS CAUSE COMING TO BE HEARD upon the Verified Complaint for Rehabilitation filed herein by THE PEOPLE OF THE STATE OF ILLINOIS, upon the relation of ANDREW BORON, Director of Insurance of the State of Illinois (the "Director"), seeking an Order of Rehabilitation as to and against Triad Guaranty Insurance Corporation ("Triad") and Triad Guaranty Assurance Corporation ("TGAC") pursuant to the provisions of Article XIII of the Illinois Insurance Code (the "Code"), 215 ILCS 5/187 *et seq.* ("Article XIII"); the Court having jurisdiction over the parties hereto and the subject matter hereof the Court having reviewed the pleadings filed herein and having considered arguments of counsel thereon, and the Court then being otherwise advised in the premises, and for good cause appearing therefore;

**The Court Hereby Finds That:**

Page 1 of 11



A.      Sufficient cause exists for the entry of an order for rehabilitation of the Defendant,
Triad, including the facts that it is insolvent and that its further transaction of business would be
hazardous to its policyholders, or to its creditors, or to the public.

B.      Sufficient cause exists for the entry of an order for rehabilitation of the Defendant,
TGAC, including the consent of its Board of Directors.

C.      Pursuant to Section 191 of the Code, 215 ILCS 5/191, the entry of this Order of
Rehabilitation creates an estate comprising of all of the liabilities and assets of Triad.

D.      Pursuant to Section 191 of the Code, 215 ILCS 5/191, the entry of this Order of
Rehabilitation creates an estate comprising of all of the liabilities and assets of TGAC.

E.      Upon the entry of this Order of Rehabilitation, the Rehabilitator's statutory
authority includes, without limitation, the following:

(i)     Pursuant to Section 191 of the Code, 215 ILCS 5/191, the Rehabilitator is vested
        by operation of law with the title to all property, contracts, and rights of action of
        Triad and TGAC; and

(ii)    Pursuant to Section 191 of the Code, 215 ILCS 5/191, the Rehabilitator is
        entitled to immediate possession and control of all property, contracts, and rights
        of action of Triad and TGAC; and

(iii)   Pursuant to Section 191 of the Code, 215 ILCS 5/191, the Rehabilitator is
        authorized to remove any and all records and property of Triad and TGAC to his
        possession and control or to such other place as may be convenient for purposes
        of the efficient and orderly administration of the rehabilitation of Triad and
        TGAC; and

(iv) Pursuant to Section 192(2) of the Code, 215 ILCS 5/192(2), the Rehabilitator is authorized to deal with the property, business and affairs of Triad and TGAC in his name, as Director, and that the Rehabilitator is authorized to deal with the property, business and affairs of Triad and TGAC in the name of Triad and TGAC, as applicable; and

(v) Pursuant to Section 192(2) of the Code, 215 ILCS 5/192(2), the Rehabilitator, without the prior approval of the Court, is authorized to sell or otherwise dispose of any real or personal property of Triad and TGAC, or any part thereof, and to sell or compromise all debts or claims owing to Triad and TGAC having a value in the amount of Twenty-Five Thousand ($25,000.00) Dollars, or less. Any such sale by the Rehabilitator of the real or personal property of Triad and TGAC having a value in excess of Twenty-Five Thousand ($25,000.00) Dollars, and sale or compromise of debts owing to Triad by the Rehabilitator where the debt owing to Triad and TGAC exceeds Twenty-Five Thousand ($25,000.00) Dollars shall be made subject to the approval of the Court; and

(vi) Pursuant to Section 192(2) of the Code, 215 ILCS 5/192(2), the Rehabilitator may solicit contracts whereby a solvent company agrees to assume, in whole or in part, or upon a modified basis, the liabilities of a company in rehabilitation in a manner consistent with subsection (4) of Section 193 of the Code, 215 ILCS 5/193(4); and

(vii) Pursuant to Section 192(3) of the Code, 215 ILCS 5/192(3), the Rehabilitator is authorized to bring any action, claim, suit or proceeding against any person with respect to that person's dealings with Triad and TGAC including, but not limited

to, prosecuting any action, claim, suit, or proceeding on behalf of the policyholders, claimants, beneficiaries or creditors of Triad and TGAC; and

(viii)    Pursuant to Section 192(4) of the Code, 215 ILCS 5/192(4), if at any time the Rehabilitator finds that it is in the best interests of the policyholders, claimants, beneficiaries, and creditors to effect a plan of rehabilitation, the Rehabilitator may submit such a plan to the Court for its approval; and

(ix)    Pursuant to Section 194(b) of the Code, 215 ILCS 5/194(b), the Rehabilitator may, within two (2) years after the entry of this Agreed Order of Rehabilitation or within such further time as applicable law permits, institute an action, claim, suit, or proceeding upon any cause of action against which the period of limitation fixed by applicable law had not expired as of the filing of the complaint upon which the rehabilitation order was entered; and

(x)    Subject to the provisions of Section 202 of the Code, 215 ILCS 5/202, the Rehabilitator is authorized to appoint and retain those persons specified in Section 202(a) of the Code, 215 ILCS 5/202(a), and to pay, without the further order of this Court, from the assets of Triad and TGAC, all administrative expenses incurred during the course of the rehabilitation of Triad and TGAC; and

(xi)    Pursuant to Section 203 of the Code, 215 ILCS 5/203, the Rehabilitator shall not be required to pay any fee to any public officer for filing, recording or in any manner authenticating any paper or instrument relating to any proceeding under Article XIII of the Illinois Insurance Code, 215 ILCS 5/187, *et seq.*, nor for services rendered by any public officer for serving any process; and

(xii)     Pursuant to the provisions of Section 204 of the Code, 215 ILCS 5/204, the Rehabilitator may seek to avoid preferential transfers of the property of Triad and TGAC and to recover such property or its value, if it has been converted, except for payments made in the ordinary course of business or payments made pursuant to 215 ILCS 5/204(m)(C).

**It Is Hereby Ordered That:**

1.     This Order of Rehabilitation is entered as, to and against Triad with a finding of insolvency

2.     This Order of Rehabilitation is entered as, to and against TGAC without a finding of insolvency.

3.     Andrew Boron, Director of Insurance of the State of Illinois, and his successors in office, is affirmed as the statutory Rehabilitator (the "Rehabilitator") of Triad and TGAC, with all of the powers appurtenant thereto.

4.     This Order of Rehabilitation is an interlocutory order appealable as of right pursuant to Illinois Supreme Court Rule 307(a)(5).

5.     Subject to the further orders of the Court, the Rehabilitator is authorized to take such actions as the nature of the cause and the interests of Triad and TGAC, their policyholders, creditors, or the public may require including, but not limited to, the following:

     i.  The Rehabilitator is directed and authorized to take immediate possession and control of the property, books, records, accounts, business and affairs, and all other assets of Triad and TGAC, and of the premises occupied by Triad and

TGAC for the transaction of their business, and to take such action as the nature of this cause and the interests of Triad's and TGAC's policyholders, creditors or the public may require, subject to further orders of the Court, pursuant to the provisions of Article XIII of the Code, *supra*;

ii. The Rehabilitator is directed and authorized to rehabilitate, wind down, or terminate Triad's and TGAC's business and affairs, and to make the continued expenditure of such wages, rents and expenses as he may deem necessary and proper for the administration of the rehabilitation of Triad and TAGC; and

iii. The Rehabilitator is authorized to sue, defend, and settle or pay claims on behalf of Triad and TGAC, or for the benefit of Triad's and TGAC's policyholders and creditors in the courts either in his name as the Rehabilitator of Triad and TGAC, or in the name of Triad and TGAC.

6. The Director is vested with the right, title and interest in all funds recoverable under treaties and agreements of excess insurance or reinsurance heretofore entered into by or on behalf of Triad and TGAC, and that all excess insurance or reinsurance companies involved with Triad and TGAC be restrained and enjoined from making any settlements with any claimant or policyholder of Triad and TGAC, or any other person, other than the Director as Rehabilitator, except with the written consent of the Director.

7. Any acts or omissions of the Rehabilitator in connection with the rehabilitation shall not be construed or considered to be a preference within the meaning of Section 204 of the Code, 215 ILCS 5/204, notwithstanding the fact that any such act or omission may cause a policyholder, third party or creditor to receive a greater percentage of debt owed to or by Triad and TGAC than any other policyholder, third party or creditor in the same class.

8.   The caption in this cause and all pleadings filed in this matter shall hereafter read:

**"IN THE MATTER OF THE REHABILITATION**
**OF TRIAD GUARANTY INSURANCE CORPORATION**
**and TRIAD GUARANTY ASSURANCE CORPORATION"**

9.   All costs of the proceedings prayed for herein shall be taxed and assessed against the Defendants, Triad and TGAC.

10.   Pursuant to its authority under Section 189 of the Code, 215 ILCS 5/189, the Court issues the following mandatory and prohibitive injunctions:

i.   In accordance with Section 191 of the Code, *supra,* all persons, companies, and entities shall immediately release their possession and control of any and all property, contracts, and rights of action of Triad and TGAC to the Director including, but not limited to, bank accounts and bank records, premium and related records, and claim, underwriting, accounting and litigation files, as follows:

a.   All accountants, auditors, actuaries, and attorneys of Triad and TGAC having knowledge of the order of rehabilitation be ordered to deliver to the Rehabilitator, at his request, copies of all documents in their possession or under their control concerning or related to Triad and TGAC, and to provide the Rehabilitator with such information as he may require concerning any and all business and/or professional relationships between them and Triad and TGAC, and concerning any and all activities, projects, jobs and the like undertaken and/or performed by them at the request of Triad and TGAC, or their respective agents, servants, officers, trustees, directors and/or employees, or which Triad and TGAC may be, or is,

entitled to as the result of their relationship with such accountants, auditors, actuaries, and attorneys; and

    b. Triad and TGAC and their respective, directors, officers, agents, third party administrators, servants, representatives, employees, and affiliated companies, and all other persons and entities having knowledge of the order of rehabilitation be ordered to give immediate possession and control to the Rehabilitator of all property, business, books, records and accounts of Triad and TGAC, and all premises occupied by Triad and TGAC for the transaction of their business; and

    c. All banks, brokerage houses, financial institutions and any and all other companies, persons or entities having knowledge of the order of rehabilitation be ordered to immediately deliver any and all such assets and/or records to the Rehabilitator; and

    d. Triad's and TGAC's agents, representatives, employees and servants having knowledge of the order of rehabilitation be ordered to immediately turn over all such funds in their possession or under their control, or to which they may hereafter acquire possession or control, to the Rehabilitator in gross and not net of any commissions which may be due thereon; and

  ii. Triad and TGAC and their respective, directors, officers, agents, servants, representatives and employees, and all other persons and entities having knowledge of this order are enjoined and restrained from transacting any business of Triad and TGAC, or disposing of any company property or assets, without the

express written consent of the Rehabilitator, or doing or permitting to be done any action which might waste the property or assets of Triad and TGAC, until the further order of the Court; and

iii. The directors, officers, agents, third party administrators, servants, representatives and employees of Triad and TGAC, and all other persons and entities, including Triad's and TGAC's policyholders and creditors, having knowledge of this order are enjoined and restrained from bringing or further prosecuting any claim, action or proceeding at law or in equity or otherwise, whether in this State or elsewhere, against Triad and TGAC, or their property or assets, or the Director as their Rehabilitator, except insofar as those claims, actions or proceedings arise in or are brought in these rehabilitation proceedings; or from obtaining, asserting or enforcing preferences, judgments, attachments or other like liens, including common law retaining liens, or encumbrances or the making of any levy against Triad and TGAC, or their property or assets while in the possession and control of the Rehabilitator, or from interfering in any way with the Rehabilitator in his possession or control of the property, business, books, records, accounts, premises and all other assets of Triad and TGAC, until the further order of the Court; and

iv. Any and all banks, brokerage houses, financial institutions and any and all other companies, persons or entities having knowledge of this order, having in its possession accounts and any other assets which are, or may be, the property of Triad and TGAC, are enjoined and restrained from disbursing or disposing of said accounts and assets and are further restrained from disposing of or destroying any records pertaining to any business transaction between Triad and TGAC, and such

banks, brokerage houses, financial institutions, companies, persons or entities having done business, or doing business, with Triad and TGAC, or having in its possession assets which are, or may be, the property of Triad and TGAC; and

v. All agents and brokers of Triad and TGAC, and their respective agents, servants, representatives and employees, and all other persons, are enjoined and restrained from returning any unearned premiums or any money in its possession, or under its control, collected from premiums, contributions or assessments upon policies, contracts or certificates of insurance or reinsurance previously issued by Triad and TGAC, to policyholders, beneficiaries, members or others; and

vi. All insurance and reinsurance companies and entities that assumed liabilities from Triad and TGAC arising under either contracts, policies of insurance, certificates of insurance, or contracts of reinsurance issued by Triad and TGAC, are enjoined and restrained from making any settlements with any claimant or policyholder of Triad and TGAC, or any other person other than the Rehabilitator, except with the written consent of the Rehabilitator, except when the reinsurance agreement, certificate, contract or treaty lawfully provides for payment to or on the behalf of Triad's and TGAC's insured by the reinsurer.

11.    That the rights and liabilities of Triad and TGAC, and of their creditors, policyholders, stockholder, and all other persons interested in their assets are not fixed by the entry of the order of rehabilitation.

12.    This Court retains jurisdiction in this cause for the purpose of granting further relief as the nature of this cause and the interests of Triad and TGAC, their policyholders, creditors, or of the public may require and/or as the Court may deem proper in the premises.

ENTERED:

# ENTERED

**DEC 11 2012**

Judge Presiding          Judge Richard J. Billik, Jr.
                         Circuit Court-1585

Lisa Madigan
Attorney General Of
The State of Illinois
Attorney for the PEOPLE OF
THE STATE OF ILLINOIS
Paul Prezioso
Assistant Attorney General
James R. Thompson Center
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
312-814-5022
Attorney Code #99000

Of Counsel:

J. Kevin Baldwin
Daniel A. Guberman
Counsel to the Director as Receiver
222 Merchandise Mart Plaza
Suite 1450
Chicago, IL 60654
(312) 836-9500
Attorney Code #16819

Page 11 of 11

### TRIAD GUARANTY INSURANCE CORPORATION
### SIXTH AMENDMENT TO
### EXCESS OF LOSS BOOK YEAR
### REINSURANCE AGREEMENT NO. A-10

This Sixth Amendment to Reinsurance Agreement (the "Sixth Amendment") is made and entered into as of April 1, 2006 by and between **TRIAD GUARANTY INSURANCE CORPORATION** ("Ceding Company"), an Illinois corporation, and **AAMBG REINSURANCE, INC.** ("Reinsurer"), a Vermont corporation, Ceding Company and Reinsurer may also hereinafter be referred to collectively as the "Parties" or individually as a "Party".

### WITNESSETH:

**WHEREAS,** the Parties desire to amend the Agreement effective April 1, 2006, with respect to loans to be reinsured under the Agreement.

**NOW, THEREFORE,** in consideration of the mutual agreements herein contained, the Parties agree as follows:

1.   Section 1.28 is deleted in its entirety and the following is substituted therefor:

"1.28 "Reinsured Loan" shall mean a loan originally insured under a Policy issued by Ceding Company to an Approved Originator and reinsured under this Agreement, provided that (a) the effective date of coverage for such loan is on or after the effective date of this Agreement and before the termination of this Agreement; (b) the Reinsurer has not provided notice to the Ceding Company at the time of loan origination that such loan is to be excluded from this Agreement at the borrower's request; (c) the loan is not subject to any structured transaction (including, but not limited to, any reinsurance agreement other than this Agreement, any risksharing agreement, or any pool insurance agreement); (d) the loan is not subject to special mortgage insurance rates (e.g., A-minus pricing) or discounted pricing; or (e) the loan LTV is not greater than ninety-seven percent (97%).

2.   Except as expressly provided in this Amendment or as necessary to effectuate the provisions of this Amendment, the terms of the Agreement and any prior amendments remain unchanged.



IN WITNESS WHEREOF, the Parties have duly executed this Amendment in duplicate original counterparts.

Reinsurer:

**AAMBG REINSURANCE, INC.**

By (Signature): _____

Name (Printed): _Stewart W. Fleming_

Title: _President_

Ceding Company:

**TRIAD GUARANTY INSURANCE CORPORATION**

By (Signature): _Ron Kessinger_

Name (Printed): _Ron Kessinger_

Title: _Sr. Exec. Vice President_

Attest (Signature): _Gordon G. Melms_

Name (Printed): _Gordon G. Melms_

Attest (Signature): _Earl F. Wall_

Name (Printed): _Earl F. Wall_

## TRIAD GUARANTY INSURANCE CORPORATION
## FIFTH AMENDMENT TO EXCESS OF LOSS BOOK YEAR REINSURANCE AGREEMENT NO. A-10

This Fifth Amendment to Reinsurance Agreement (the "Fifth Amendment") is made and entered into as of January 1, 2005 by and between **TRIAD GUARANTY INSURANCE CORPORATION** ("Ceding Company"), an Illinois corporation, and **AAMBG REINSURANCE, INC.** ("Reinsurer"), a Vermont corporation. Ceding Company and Reinsurer may also hereinafter be referred to collectively as the "Parties" or individually as a "Party."

### WITNESSETH:

**WHEREAS**, the Parties desire to amend the Agreement effective January 1, 2005, with respect to loans to be reinsured under the Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained, the Parties agree as follows:

1. Section 1.28 is deleted in its entirety and the following is substituted therefor:

   "1.28 "Reinsured Loan" shall mean a loan originally insured under a Policy issued by Ceding Company to an Approved Originator and reinsured under this Agreement, provided that (a) the effective date of coverage for such loan is on or after the effective date of this Agreement and before the termination of this Agreement, (b) the Reinsurer has not provided notice to the Ceding Company at the time of loan origination that such loan is to be excluded from this Agreement at the borrower's request; (c) the loan is not subject to any structured transaction (including, but not limited to, any reinsurance agreement other than this Agreement, any risksharing agreement, or any pool insurance agreement); (d) the loan is not subject to special mortgage insurance rates (e.g., A-minus pricing) or discounted pricing or (e) the loan is not an "interest only" loan."

2. Section 1.27 is deleted in its entirety and the following is substituted therefor:

   "1.27 "Reinsurance Premiums" shall mean forty percent (40%) of the Gross Written Premiums."

3. Section 6.1 is deleted in its entirety and the following is substituted therefor:

   "Ceding Company shall pay Reinsurer monthly, as set forth in Section 10, Reinsurance Premiums for each Reinsured Loan for so long as that Reinsured Loan is reinsured under this Agreement."

4. Except as expressly provided in this Amendment or as necessary to effectuate the provisions of this Amendment, the terms of the Agreement and any prior amendments remain unchanged.

J:\Law\Earl_Share\Agreements\Fifth Amendment to AAMBG Reinsurance.doc

IN WITNESS WHEREOF, the Parties have duly executed this Amendment in duplicate original counterparts.

Reinsurer:

AAMBG REINSURANCE, INC.

By (Signature): _____

Name (Printed): _Stewart W. Fleming_

Title: _President, AAMBG_

Ceding Company:

TRIAD GURANTY INSURANCE CORPORATION

By (Signature): _Shirley Gaddy_

Name (Printed): _Shirley Gaddy_

Title: _Sr. Vice President Opee_

Attest (Signature): _Gordon G. Melms_

Name (Printed): _Gordon G. Melms_

Attest (Signature): _Earl F. Wall_

Name (Printed): _Earl F. Wall_

## TRIAD GUARANTY INSURANCE CORPORATION
## FOURTH AMENDMENT TO EXCESS OF LOSS BOOK YEAR REINSURANCE AGREEMENT NO. A-10

This Fourth Amendment to Reinsurance Agreement (the "Fourth Amendment") is made and entered into as of April 15, 2003 by and between **TRIAD GUARANTY INSURANCE CORPORATION** ("Ceding Company"), an Illinois corporation, and **AAMBG REINSURANCE, INC.** ("Reinsurer"), a Vermont corporation. Ceding Company and Reinsurer may also hereinafter be referred to collectively as the "Parties" or individually as a "Party."

### WITNESSETH:

WHEREAS, the Parties desire to amend the Agreement to clarify their original intent with respect to loans to be reinsured under the Agreement; and

WHEREAS, the Parties desire to amend the Agreement to modify a termination provision pursuant to Vermont law.

NOW THEREFORE, in consideration of the mutual agreements herein contained, the Parties agree as follows:

1. Section 1.28 is deleted in its entirety and the following is substituted therefore:

   "1.28 "Reinsured Loan" shall mean a loan originally insured under a Policy issued by Ceding Company to an Approved Originator and reinsured under this Agreement, provided that (a) the effective date of coverage for such loan is on or after the effective date of this Agreement and before the termination of this Agreement, (b) the Reinsurer has not provided notice to the Ceding Company at the time of loan origination that such loan is to be excluded from this Agreement at the borrower's request; (c) the loan is not subject to any structured transaction (including, but not limited to, any reinsurance agreement other than this Agreement, any risksharing agreement, or any pool insurance agreement) or (d) the loan is not subject to special mortgage insurance rates (e.g., A-minus pricing) or discounted pricing."

2. A new Section 5.6 is added as follows:

   "5.6 If, at any time, the funds in the Trust are insufficient to pay in full any amount(s) then due and payable, and this results in the insolvency of the Reinsurer, then coverage under this Agreement shall automatically and immediately terminate and all amounts remaining in the Trust shall be remitted to the Ceding Company, which shall reassume all liabilities. All rights and obligations of both parties under this Agreement shall be extinguished as of the date of such termination."

3. Except as expressly provided in this Amendment or as necessary to effectuate the provisions of this Amendment, the terms of the Agreement and any prior amendments remain unchanged.

**IN WITNESS WHEREOF,** the Parties have duly executed this Amendment in duplicate original counterparts.

**Reinsurer:**

**AAMBG REINSURANCE, INC.**

By (Signature): _____

Name (Printed): Stewart W. Fleming

Title: Group Senior Vice President

**Ceding Company:**

**TRIAD GUARANTY INSURANCE CORPORATION**

By (Signature): Ron Kessinger

Name (Printed): Ron Kessinger

Title: Exec. Vice President

Attest (Signature): _____

Name (Printed): Sally A. Raffler

Attest (Signature): Earl F. Wall

Name (Printed): Earl F. Wall

## TRIAD GUARANTY INSURANCE CORPORATION
## THIRD AMENDMENT TO EXCESS OF LOSS BOOK YEAR REINSURANCE AGREEMENT NO. A-10

This Third Amendment to Reinsurance Agreement (the "Third Amendment") is made and entered into as of _January 1, 2001_ by and between **TRIAD GUARANTY INSURANCE CORPORATION** ("Ceding Company"), an Illinois corporation, and **AAMBG REINSURANCE, INC.** ("Reinsurer"), a Vermont corporation. Ceding Company and Reinsurer may also hereinafter be referred to collectively as the "Parties" or individually as a "Party."

### WITNESSETH:

In consideration of the mutual agreements herein contained, the Parties agree as follows:

I.     <u>AMENDMENTS TO AGREEMENT.</u>

    (A)     Section 1 (Definitions) is hereby amended as follows:

        1.27     "Reinsurance Premiums" shall mean forty-five and seventy-one hundredths percent (45.71%) of the Gross Written Premiums.

        1.30     "Reinsurer Attachment" shall mean, as set forth in Section 3, a Policy Year Paid Claims Ratio of four percent (4%).

        1.32     "Reinsurer Limit" shall mean, as set forth in Section 3, a Policy Year Paid Claims ratio of fourteen percent (14%).

    (B)     Section 3 (Amount of Cover) is hereby amended as follows:

        Reinsurer shall be liable for and shall reimburse Ceding Company for one hundred percent (100%) of all cumulative Net Losses paid by Ceding Company with respect to Reinsured Loans for each Policy Year in excess of cumulative Net Losses that produce a Policy Year Paid Claims Ratio of four percent (4%) (the "Reinsurer Attachment"); however, in no event shall Reinsurer be liable for that portion of any cumulative Net Losses that produce a Policy Year Paid Claims Ratio of fourteen percent (14%) or more (the "Reinsurer Limit"). Each Policy Year Paid Claims Ratio shall be computed at the end of each Quarterly Cycle, and shall be computed separately and not be aggregated with other Policy Years, to determine if the Reinsurer Attachment has been reached.

    (C)     Section 6 (Reinsurance Premiums and Taxes) is hereby amended as follows:

6.1 Ceding Company shall pay Reinsurer quarterly, as set forth in Section 10, Reinsurance Premiums for each Reinsured Loan for so long as that Reinsured Loan is reinsured under this Agreement. Ceding Company shall receive a ceding commission of twelve and fifty one-hundredths percent (12.5%) of the Reinsurance Premiums.

**IN WITNESS WHEREOF,** the Parties have duly executed this Amendment in duplicate original counterparts.

Reinsurer:                                    Ceding Company:

**AAMBG REINSURANCE, INC.**          **TRIAD GUARANTY INSURANCE CORPORATION**

By (Signature): _____      By (Signature): _____

Name (Printed): Stewart W. Fleming   Name (Printed): Ron Kessinger

Title: _____President_____            Title: Exec. Vice President

Attest (Signature): _____  Attest (Signature): _____

Name (Printed): Sally A. Raffler     Name (Printed): Earl F. Wall

### TRIAD GUARANTY INSURANCE CORPORATION
### SECOND AMENDMENT TO EXCESS OF LOSS BOOK YEAR REINSURANCE
### AGREEMENT NO. A-10

This Second Amendment to Reinsurance Agreement (the "Second Amendment") is made and entered into as of ͟January 1, 2000͟ by and between **TRIAD GUARANTY INSURANCE CORPORATION** ("Ceding Company"), an Illinois corporation, and **AAMBG REINSURANCE, INC.** ("Reinsurer"), a Vermont corporation. Ceding Company and Reinsurer may also hereinafter be referred to collectively as the "Parties" or individually as a "Party."

#### WITNESSETH:

In consideration of the mutual agreements herein contained, the Parties agree as follows:

I.     <u>AMENDMENTS TO AGREEMENT.</u>

     (A)     Section 1 (Definitions) is hereby amended as follows:

         1.27    "Reinsurance Premiums" shall mean forty-three and seventy-five hundredths percent (43.75%) of the Gross Written Premiums.

         1.30    "Reinsurer Attachment" shall mean, as set forth in Section 3, a Policy Year Paid Claims Ratio of five percent (5%).

         1.32    "Reinsurer Limit" shall mean, as set forth in Section 3, a Policy Year Paid Claims ratio of twelve percent (12%).

     (B)     Section 3 (Amount of Cover) is hereby amended as follows:

         Reinsurer shall be liable for and shall reimburse Ceding Company for one hundred percent (100%) of all cumulative Net Losses paid by Ceding Company with respect to Reinsured Loans for each Policy Year in excess of cumulative Net Losses that produce a Policy Year Paid Claims Ratio of five percent (5%) (the "Reinsurer Attachment"); however, in no event shall Reinsurer be liable for that portion of any cumulative Net Losses that produce a Policy Year Paid Claims Ratio of twelve percent (12%) or more (the "Reinsurer Limit"). Each Policy Year Paid Claims Ratio shall be computed at the end of each Quarterly Cycle, and shall be computed separately and not be aggregated with other Policy Years, to determine if the Reinsurer Attachment has been reached.

     (C)     Section 6 (Reinsurance Premiums and Taxes) is hereby amended as follows:

         6.1 Ceding Company shall pay Reinsurer quarterly, as set forth in Section 10, Reinsurance Premiums for each Reinsured Loan for so long as that



Reinsured Loan is reinsured under this Agreement. Ceding Company shall receive a ceding commission of twenty percent (20%) of the Reinsurance Premiums.

**IN WITNESS WHEREOF,** the Parties have duly executed this Amendment in duplicate original counterparts.

Reinsurer:                          Ceding Company:

**AAMBG REINSURANCE, INC.**          **TRIAD GUARANTY INSURANCE CORPORATION**

By (Signature): _____      By (Signature): _____

Name (Printed): Stewart W. Fleming   Name (Printed): Ron Kessinger

Title: President                     Title: Exec. V.P

Attest (Signature): _____  Attest (Signature): Earl F. Wall

Name (Printed): Sally A. Raffler      Name (Printed): Earl F. Wall

# TRIAD GUARANTY INSURANCE CORPORATION
## EXCESS OF LOSS BOOK YEAR REINSURANCE AGREEMENT NO. A-10

This Reinsurance Agreement (the "Agreement") is made and entered into as of *June 5, 1999* by and between TRIAD GUARANTY INSURANCE CORPORATION ("Ceding Company"), an Illinois corporation, and AAMBG REINSURANCE, INC.("Reinsurer"), a Vermont corporation. Ceding Company and Reinsurer may also hereinafter be referred to collectively as the "Parties" or individually as a "Party."

### WITNESSETH:

In consideration of the mutual agreements herein contained, the Parties agree as follows:

1. **Definitions:**

   The following terms in quotation marks, when capitalized, shall have the meanings in this Agreement as set forth below:

   1.1 "Allocated Loss Adjustment Expenses" shall mean those out-of-pocket expenses which relate to the adjustment of a Loss including, but not limited to, court costs, interest upon judgements as it accrues, and allocated investigation, adjustment and legal expenses chargeable to the investigation, negotiation, settlement or defense of a claim.

   1.2 "Approved Originator" shall mean the entity or entities named on Schedule A attached to this Agreement, as Schedule A may be amended from time to time in accordance with Section 2.2.

   1.3 "Business Day" shall mean any regularly scheduled work day for employees of the U.S. Government.

   1.4 "Capital Ratio" means the ratio, expressed as a percentage, of (i) Policyholders' Reserves to (ii) the sum of the Reinsurer Layers for all Policy Years.

   1.5 "Capital Requirement" shall mean ten percent (10%) of the Reinsurer Layer.

   1.6 "Ceding Company" shall have the meaning set forth in the Preamble.

   1.7 "Claim Payment" shall mean, with respect to a Reinsured Loan, the amount actually paid by Ceding Company to an Insured as required by the applicable Policy.

   1.8 "Claims-Related Extra Contractual Obligation" shall mean, with respect to a Reinsured Loan, any amount for which Ceding Company is liable as a result of a

judgment, settlement or arbitration, or otherwise, to an Insured or a third-party claimant, where such liability has arisen because of: .

    (a)    the failure of Ceding Company to pay a claim within Policy limits, or

    (b)    bad faith or negligence (but not willful and wanton misconduct) in investigating or handling a claim or in rejecting an offer of settlement.

Any Claims-Related Extra Contractual Obligation shall be deemed to have been incurred on the same date as the event giving rise to the claim to which such Claims-Related Extra Contractual Obligation is related.

1.9 "Commissioner" shall mean the Director of Insurance of Illinois and the commissioner of insurance of any other jurisdiction where Ceding Company is licensed to the extent that any such other jurisdiction has, or asserts, jurisdiction over the transactions covered by this Agreement.

1.10 "Contingency Reserve" shall mean the contingency reserve as calculated in accordance with the applicable laws of the State of Illinois. .

1.11 "Default" shall have the same meaning in this Agreement as that term or an equivalent term has in a Policy.

1.12 "Gross Written Premiums" shall mean, with respect to Reinsured Loans, gross premiums received by Ceding Company, after the effective date of this Agreement, less cancellation and return premiums (returned for whatever reason).

1.13 "Insured" shall have the same meaning in this Agreement as that term or an equivalent term has in a Policy.

1.14 "Loss" shall have the same meaning in this Agreement as that term or an equivalent term has in a Policy. In particular, a Loss shall be deemed to have occurred, or to have been incurred, when a Default occurs, notwithstanding that the amount of the Loss is not then either presently ascertainable or due and payable.

1.15 "Loss Reserves" means IBNR reserves and reserves for losses reported but unpaid.

1.16 "Mortgage Guaranty Insurance" shall mean insurance against financial loss by reason of nonpayment of principal, interest and other sums agreed to be paid under the terms of any note, bond or other evidence of indebtedness secured by a mortgage, deed of trust, or other instrument constituting or equivalent to a first lien or charge on.

    (a) real estate, provided the improvement on such real estate is a residential building or a condominium or manufactured or mobile housing deemed to be real estate or buildings designed for occupancy by not more than four (4) families, or

(b) an ownership interest in, and a proprietary lease from, a corporation or partnership formed for the purpose of the cooperative ownership of real estate.

1.17 "Net Losses" shall mean, with respect to the Reinsured Loans, the ultimate net losses sustained by Ceding Company after the effective date of this Agreement, including, but not limited to,

(a) Claim Payments, and

(b) Allocated Loss Adjustment Expense payments, and

(c) any payments for Claims-Related Extra Contractual Obligations, less

(d) any salvage or recovery, whether recovered or received prior or subsequent to settlement under this Agreement, shall be applied as if recovered or received prior to the settlement and shall be first deducted from the actual loss sustained to arrive at the Net Loss. Salvage or recovery shall not include amounts recoverable by Ceding Company under any other reinsurance agreement.

Nothing in this Agreement shall be construed to mean losses are not recoverable hereunder until the Net Loss to Ceding Company has been ascertained.

1.18 "Original Risk" shall mean the percentage coverage under the applicable Policy for a Reinsured Loan, multiplied by the initial principal balance of the Reinsured Loan.

1.19 "Party" and "Parties" shall have the meaning set forth in the Preamble.

1.20 "Policy" shall mean any Mortgage Guaranty Insurance policy or master policy, and any certificates issued thereunder and endorsements attached thereto, that provides coverage for an individual loan.

1.21 "Policyholder Reserves" means, as of any date, all amounts on deposit in the Trust as of such date less the portion, if any, of such amounts representing Unearned Premium Reserves.

1.22 "Policy Year" shall mean each whole calendar year (i.e. each January 1 through December 31) provided, however, that partial years will be aggregated with the immediately preceding or succeeding whole calendar year or, in the absence of a preceding or succeeding whole calendar year, will constitute a Policy Year for purposes of this Agreement.

1.23 "Policy Year Paid Claims Ratio" shall mean that ratio calculated for each Policy Year, expressed as a percentage, obtained by dividing

(a) Cumulative Net Losses for Reinsured Loans with an effective date of coverage under the applicable Policy within such Policy Year by

(b) Total Original Risk for Reinsured Loans with an effective date of coverage under the applicable Policy within such Policy Year.

The Policy Year Paid Claims Ratio is a cumulative number, calculated on an inception to date basis whenever calculated.

1.24 "Property" shall have the same meaning in this Agreement as that term or an equivalent term has in a Policy.

1.25 "Quarterly Cycle" shall mean a period ending on a March 31, June 30, September 30 or December 31.

1.26 "Reinsurance Claim" shall mean the amount payable by Reinsurer to Ceding Company.

1.27 "Net Reinsurance Premiums" shall mean twenty-five percent (25%) of the Gross Written Premiums.

1.28 "Reinsured Loan" shall mean a loan originally insured under a Policy issued by Ceding Company to an Approved Originator and reinsured under this Agreement, provided that (a) the effective date of coverage for such loan is on or after the effective date of this Agreement and before the termination of this Agreement, and (b) the Reinsurer has not provided notice to the Ceding Company at the time of loan origination that such loan is to be excluded from this Agreement at the borrower's request.

1.29 "Reinsurer" shall have the meaning set forth in the Preamble.

1.30 "Reinsurer Attachment" shall mean, as set forth in Section 3, a Policy Year Paid Claims Ratio of five percent (5%).

1.31 "Reinsurer Layer" shall mean the amount of Cumulative Net Losses for which Reinsurer shall be liable [(Reinsurer Limit - Reinsurer Attachment) x Total Original Risk].

1.32 "Reinsurer Limit" shall mean, as set forth in Section 3, a Policy Year Paid Claims Ratio of ten percent (10%).

1.33 "Total Original Risk" shall mean, with respect to a Policy Year, the sum of the Original Risk for Reinsured Loans with an effective date of coverage under the applicable Policy within the same Policy Year.

1.34. "Unearned Premium Reserves" shall mean the pro-rata portion of the Gross Written Premiums applicable to the unexpired period of the Policy term.

## 2. Applicability of Agreement:

2.1 Reinsurer shall indemnify Ceding Company for Reinsurer Layer, as provided in Section 3 of this Agreement, that may accrue to Ceding Company for a covered Policy Year with respect to Reinsured Loans as a result of any Loss incurred from the first day of such Policy Year until 11:59 PM on December 31, ten years after the end of the Policy Year. This Agreement is intended to cover Losses incurred during such ten (10) year period even though such Losses may not be paid until after such ten (10) year period.

2.2 The Parties agree that Schedule A may be amended:

(a) to add an affiliate of Reinsurer that is not then listed on Schedule A by Reinsurer notifying Ceding Company that such affiliate is to be added to Schedule A and Ceding Company shall, within a reasonable time thereafter, execute an amended Schedule A to reflect the addition of any such affiliate and such amendment shall be effective as of the date that Ceding Company receives such notice from Reinsurer unless Reinsurer specifies a later date when the amended Schedule A shall be effective. For purposes of this Agreement, an affiliate of Reinsurer is any company or other entity that is shown or is required to be shown on a holding company disclosure statement filed by, or with respect to, Reinsurer, or

(b) to add any other entity not then listed on Schedule A, by the mutual written agreement of the Parties, and such amended Schedule A shall be effective as of the date the Parties may mutually agree and set forth in the amended Schedule A.

## 3. Amount of Cover:

Reinsurer shall be liable for and shall reimburse Ceding Company for one hundred percent (100%) of all cumulative Net Losses paid by Ceding Company with respect to Reinsured Loans for each Policy Year in excess of cumulative Net Losses that produce a Policy Year Paid Claims Ratio of five percent (5%) (the "Reinsurer Attachment"); however, in no event shall Reinsurer be liable for that portion of any cumulative Net Losses that produce a Policy Year Paid Claims Ratio of ten percent (10%) or more (the "Reinsurer Limit"). Each Policy Year Paid Claims Ratio shall be computed at the end of each Quarterly Cycle, and shall be computed separately and not be aggregated with other Policy Years, to determine if the Reinsurer Attachment has been reached.

## 4. Follow the Fortunes:

4.1 Reinsurer's liability shall attach simultaneously with that of Ceding Company and shall be subject in all respects to the same risks, terms, conditions, interpretations,

waivers, and to the same modifications, alterations and cancellations as the respective insurance of Ceding Company, the true intent of this Agreement being that Reinsurer shall, in every case to which this Agreement applies, follow the fortunes of Ceding Company.

4.2 Nothing in this Agreement shall in any manner create any obligations or establish any rights against Reinsurer in favor of any third parties or any persons not parties to this Agreement.

## 5. Effective Date, Term and Termination:

5.1 This Agreement shall be effective as of 12:01 a.m., Eastern Time, on June 8 1999 and shall remain in force until terminated in accordance with this Section 5.

5.2 Either Party may terminate this Agreement as of 11:59 p.m., Eastern Time on the date of termination by providing at least ninety (90) days prior written notice thereof to the other Party in accordance with the notice provisions of Section 16.4.

5.3 Either Party may immediately terminate this Agreement in the event that the other should at any time become insolvent, or suffer any impairment of capital, or go into or be placed in liquidation or rehabilitation, or have a receiver or conservator appointed, or if any law or regulation of any federal agency or any state in which Ceding Company is doing business should render this Agreement illegal. Ceding Company may cease ceding additional risk under this Agreement or terminate this Agreement if so ordered by the Commissioner. Ceding Company shall have the right to terminate this Agreement if, at any time, financial statement credit is disallowed by any state in which Ceding Company is licensed for the cession of risk under this Agreement or if Reinsurer fails to establish and maintain, funded in appropriate amounts, the Trust Account required by this Agreement. For terminations exercised under this Section 5.3, Ceding Company shall have the option of an immediate settlement of all present and future obligations under this Agreement.

5.4 Either Party may terminate this Agreement at any time if:

(a) any payment to be made hereunder by the other Party is more than ten (10) days overdue, and said payment has not been made within five (5) days after written notice to pay has been served upon the Party not paying, or

(b) there is a material breach by the other Party with respect to any of its representations, warranties or obligations set forth herein, and said breach has not been cured within ten (10) days after written notice to cure said breach has been served upon the Party committing said breach.

5.5 Notwithstanding any termination as provided for in this Agreement, both Ceding Company and Reinsurer shall continue to be liable to each other for Reinsurance

6

Premiums, Losses incurred (as set forth in Section 2.1), and all other obligations under this Agreement, with respect to all Reinsured Loans for each Policy Year prior to the termination of this Agreement, until the natural expiration, cancellation or termination of coverage of each Reinsured Loan within such Policy Year, or until 11:59 PM on December 31, ten years after the end of the Policy Year, whichever shall first occur, unless Ceding Company and Reinsurer shall mutually agree that such termination shall be (a) on a clean-cut basis and with Reinsurer receiving total control over the trust funds and incurring no further liability with respect to any Reinsured Loan, in which event Reinsurer shall not continue to receive Reinsurance Premiums with respect thereto or (b) by commutation of the remaining liability, based upon a good faith actuarial estimate of applicable and anticipated Reinsurance Claims and Reinsurance Premiums calculated by Ceding Company and agreed to by Reinsurer.

6. Reinsurance Premiums and Taxes:

6.1 Ceding Company shall pay Reinsurer quarterly, as set forth in Section 10, Reinsurance Premiums for each Reinsured Loan for so long as that Reinsured Loan is reinsured under this Agreement. Reinsurance Premiums as defined in Section 1.27 are net of the twenty percent (20%) ceding commission due Ceding Company from Reinsurer.

6.2 Ceding Company shall be liable for any and all premium taxes imposed on premiums written with respect to Policies covering Reinsured Loans. Reinsurer shall be liable for any and all premium taxes imposed on Reinsurance Premiums.

7. Capital and Reserves:

The respective Parties shall establish and maintain all such capital and all such reserves as may be required with respect to Unearned Premium Reserves, Contingency Reserves and Loss or Allocated Loss Adjustment Expenses Reserves relating to each risk.

8. Claim Settlement and Inspections:

8.1 All Losses, compromises of Losses and expenses and allowances in consequence of a claim for benefits under a Policy shall be settled by Ceding Company. Ceding Company agrees to settle each claim under a Policy in a manner which, in its good faith opinion, is in accordance with the terms and conditions of the Policy as interpreted in good faith by Ceding Company. Nevertheless, Ceding Company shall have the authority to grant reasonable extensions of time for the filing of claims and to waive notice requirements by Insureds and such other technical Policy violations as it deems reasonable and prudent to effectuate a good faith application of the terms imposed by the Policy.

8.2 Reinsurer or its duly accredited representative shall have the right, during the term and within a reasonable time after the termination of this Agreement, to request and obtain information and copies of papers (including any printed, written, recorded, taped,

electronic, graphic, computerized printout or other tangible matter) and files in connection with any Policy or Reinsured Loan and shall have the privilege to inspect all books, records, agreements and papers in connection with any Policy or with respect to any Reinsurance Claim, Gross Written Premiums, Reinsurance Premium, Net Losses, if any, and salvage or recovery. Reinsurer or its duly accredited representative shall also be entitled, during the term and within a reasonable time after the termination of this Agreement, to audit Ceding Company's said documents, books and papers to determine the accuracy of any report required or Reinsurance Claim, Gross Written Premiums, Reinsurance Premium, Net Losses, salvage, or recovery. Such inspections and audits shall be conducted during usual business hours at Ceding Company's office where such records are regularly maintained. If such audit shows that there is a deficiency in any payments due hereunder, then the deficiency shall become immediately due and payable.

9. Reinsurance Claim Procedures:

9.1 Ceding Company shall file Reinsurance Claims with Reinsurer as provided for herein in a form approved by the Parties. Payments due from Reinsurer for Reinsurance Claims shall be made to Ceding Company. Ceding Company shall pay all expenses pertaining to reporting to Reinsurer.

9.2 Except as provided by Section 8.1, no Reinsurance Claim shall be made by Ceding Company or payable by Reinsurer unless and until all terms and conditions of the Policy with respect to the Claim Payment which is the basis for such Reinsurance Claim have been complied with and satisfied and Ceding Company has paid the Insured all amounts due with respect to such Loss.

9.3 All Reinsurance Claims shall be filed within the time period set forth in Section 10 hereof. Such Reinsurance Claims shall be made in accordance with the provisions of Section 16.4. Ceding Company shall also furnish upon the request of Reinsurer, made within a reasonable period not to exceed one hundred eighty (180) days after the end of the Quarterly Cycle for which such Reinsurance Claims were submitted, true and complete copies of all of its records and information concerning such Reinsurance Claims and Net Losses for verification by Reinsurer. Ceding Company shall not unreasonably deny requests for copies of such documentation for purposes of verification after the one hundred eighty (180) day period has elapsed if Reinsurer demonstrates good cause for such request. Reinsurer shall pay all Reinsurance Claims within the time period set forth in Section 10 hereof.

10. Reports and Remittances:

10.1 Quarterly Reports. Within forty-five (45) days after the end of each Quarterly Cycle, for such Quarterly Cycle, Ceding Company shall submit to Reinsurer reports containing the following information for Reinsured Loans, reported separately for each Policy Year:

(a) Insurance in Force. A summary of Ceding Company's Insurance in force, Risk in force, and Unearned Premium Reserves, before any deduction for reinsurance hereunder.

(b) Premiums. A summary of aggregate loan balances for which either an initial premium or renewal premium therefor was paid to Ceding Company, the Policy number, the Gross Written Premiums and Unearned Premium Reserves.

(c) Reinsurance Premiums. Reinsurance Premiums due from Ceding Company.

(d) Reserves. including Loss Reserves and Unearned Premium Reserves, established by the Ceding Company with respect to the Reinsured Loans.

(e) Property Acquired. As of the end of such Quarterly Cycle, the number of Properties that it has acquired (but not sold) pursuant to a Policy, its cost in acquiring such Properties, the amount of reserve therefor that Ceding Company has established, without any deduction for reinsurance.

(f) Reinsurance Claims. Net Losses and the Reinsurance Claim, if any, due from Reinsurer.

10.2 Annual Reports. Within forty-five (45) days after the end of each Policy Year, Ceding Company shall submit to Reinsurer a report for that Policy Year listing for Policies in force under this Agreement in the aggregate, gross insurance in force and gross risk in force hereunder by state.

10.3 Additional Information. Such quarterly and annual reports shall also contain such additional information as may be required under this Agreement or as may be reasonably requested from time to time by Reinsurer from Ceding Company, and such reports shall in all events provide sufficient information to allow Reinsurer to meet the filing requirements of the NAIC Annual Convention Statement, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any other regulatory agency or rating entity. Ceding Company is entitled to receive quarterly and annual statutory statements required to be filed by Reinsurer, and may reasonably request from time to time additional information to allow Ceding Company to meet all requirements of the NAIC, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any other regulatory agency or rating entity.

10.4 Remittances. The balance after offset due to a Party by the other Party hereunder shall be paid

(a) if to Ceding Company, within fifteen (15) days following the receipt by Reinsurer of a quarterly report delivered pursuant to Section 10.1 for such Quarterly Cycle; or

(b) if to Reinsurer, within forty-five (45) days after the end of a Quarterly Cycle and as an accompaniment to the quarterly report delivered pursuant to Section 10. 1 for such Quarterly Cycle.

All Reinsurance Premiums and Reinsurance Claims due hereunder and all accountings rendered and settlements made hereunder shall be in United States Dollars.

11. Representations:

11.1 Representations by Ceding Company. Ceding Company makes the following representations and warranties:

(a) It is duly authorized and qualified to carry on the business of Mortgage Guaranty Insurance in each state where a Policy was issued and meets the requirements for carrying on such business.

(b) It has taken all corporate action necessary to enable it to enter into and carry out this Agreement.

(c) It is qualified as a writer of Mortgage Guaranty Insurance on loans to be purchased by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association.

(d) All reports required and all Reinsurance Claims submitted hereunder shall be accurate and complete.

(e) No Reinsurance Claim shall be submitted to Reinsurer except in connection with a Loss on a Reinsured Loan reinsured under the Agreement.

(f) Each such warranty and representation is material to this Agreement and relied upon by Reinsurer in entering into this Agreement. Each such representation and warranty shall continue to be true during the term of this Agreement.

11.2 Representations by Reinsurer. Reinsurer makes the following representations and warranties:

(a) It is duly authorized and has the legal capacity to accept and to write the reinsurance contemplated by this Agreement.

(b) It has taken all corporate action necessary to enable it to enter into and carry out this Agreement.

(c) Reinsurer shall allow Ceding Company to examine true and accurate copies of any and all other reinsurance agreements Reinsurer enters into that cede any part of the risk Reinsurer accepts from the Ceding Company hereunder, but Reinsurer

10

shall be allowed to redact any and all information regarding reinsurance premiums due with respect to any such reinsurance agreement.

(d) Reinsurer will limit its business, for so long as there is risk ceded under this Agreement, to the reinsurance of Mortgage Guaranty Insurance, insured under a Policy, as such terms are defined in this Agreement.

(e) Each such warranty and representation is material to this Agreement and relied upon by Ceding Company in entering into this Agreement. Each such representation and warranty shall continue to be true during the term of this Agreement.

## 12. Insolvency of Ceding Company:

12.1 Any risk or obligation assumed by Reinsurer pursuant to this Agreement shall be payable by Reinsurer on the basis of its liability under this Agreement without diminution because of any insolvency of Ceding Company. In the event of insolvency and the appointment of a conservator, liquidator or statutory successor of Ceding Company, all Reinsurance Claims shall be payable to such conservator, liquidator or statutory successor in accordance with this Agreement, with reasonable provision for verification, on the basis of Claims allowed against Ceding Company by any court of competent jurisdiction or by any conservator, liquidator or statutory successor of Ceding Company having authority to allow such claims, without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any such claim. Payments by Reinsurer as set forth above shall be made directly to Ceding Company or to its conservator, liquidator or statutory successor.

12.2 The conservator, liquidator or statutory successor of Ceding Company shall give written notice of the filing of a claim against Ceding Company within a reasonable time after such claim is filed and Reinsurer may interpose, at its own expense, in the proceedings where such claim is or may be adjudicated, any defense or defenses which it may deem available to Ceding Company or its conservator, liquidator or statutory successor. The expense thus incurred by Reinsurer shall be payable subject to court approval out of the estate of Ceding Company as part of the expenses of conservation or liquidation to the extent of a proportionate share of the benefit which may accrue to Ceding Company in conservation or liquidation, solely as a result of the defense undertaken by Reinsurer.

## 13. Trust Agreement:

13.1 Concurrent with the execution of this Agreement and in conformity with law, the Reinsurer shall enter into a trust agreement (the "Trust Agreement") in a form acceptable to the Ceding Company and establish a trust account (the "Trust Account") for the benefit of the Ceding Company to support Reinsurer's obligations under this Agreement.

13.2 The capital fund portion of the Trust Account shall be funded quarterly in an amount, in dollars and cents, equal to the Capital Requirement.

13.3 The Reinsurer shall maintain reserves with respect to its Loss and unearned premium liabilities hereunder as required by the laws and regulations of the Ceding Company's domicile. The Reinsurer shall maintain a contingency reserve in an amount equal to, with respect to each Policy Year, 50% of the ceded earned premium for such Policy Year. Reinsurer shall be required to maintain such reserve for a period of one hundred twenty (120) months or the end of Run-Off, after which it shall be released and become a part of the general and unrestricted assets of the Reinsurer. The Reinsurer shall take all steps which are necessary for the Ceding Company to obtain full financial statement credit for the reinsurance provided hereunder according to the statutory requirements in the Ceding Company's domicile. Any term or condition required by such requirements to be included in this Agreement for the Ceding Company to receive full financial credit for the reinsurance provided hereunder shall be deemed incorporated in this Agreement by this reference.

13.4 In order to assure that Ceding Company receives financial statement credit for the reinsurance provided by this Agreement, the Trust Account must be adequately funded by the date of each annual or quarterly financial statement to be filed by Ceding Company with the appropriate regulatory authorities.

13.5 Whenever the Trust Account is less than that required by Sections 13.2 and 13.3, Ceding Company shall remit all Reinsurance Premiums to the Trustee under the Trust Agreement and all investment income, dividends, and capital gain from, and other increases in, the assets of the Trust Account shall be added to the capital portion of the Trust Account. Whenever the Trust Account is greater than that required by Sections 13.2 and 13.3, the following amounts shall be paid to the Reinsurer from the Trust upon reasonable verification by the Ceding Company of the accuracy of such amounts: (i) premium taxes on gross written premiums assumed by the Reinsurer (as required by law); (ii) an amount not to exceed $15,000 per quarter (or such greater amount as may be agreed to in writing by the Ceding Company in its sole discretion), in respect of the Reinsurer's actual and necessary out-of-pocket operational expenses; and (iii) an amount necessary, from time to time, to enable the Reinsurer to pay federal income taxes relating to this Agreement which are actually due and owing. The amount actually payable pursuant to clause (ii) of this Section 13.5 shall not exceed the Ceding Company's pro-rata share of operational expenses after taking into account the portion of all operating expenses fairly allocable to other mortgage insurance companies ceding business to the Reinsurer.

13.6 All assets deposited pursuant to the Trust Agreement shall be valued in accordance with the terms and conditions of the Trust Agreement.

14. Jurisdiction and Agent for Service of Process:

14.1 In accordance with Illinois Statute 215 ILCS 5/173.1 (1) (E) as it may be amended from time to time:

(a) If Reinsurer fails to perform its obligations under the terms of this Agreement, Reinsurer, at Ceding Company's request, shall submit to the jurisdiction of any court of competent jurisdiction in any state of the United States, shall comply with all requirements necessary to give the court jurisdiction, and shall abide by the final decision of the court or of any appellate court if there is an appeal.

(b) Reinsurer designates the Commissioner as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding begun by or on behalf of Ceding Company.

15. Arbitration:

15.1 All disputes or differences arising out of the interpretation of this Agreement shall be submitted to the decision of two arbitrators, one to be chosen by each Party, and in the event of the arbitrators failing to agree, to the decision of an umpire to be chosen by the arbitrators. The arbitrators and umpire shall be disinterested active or retired officials of fire or casualty insurance or reinsurance companies but may not be active or retired executive officials of mortgage guaranty insurance companies. If either Party fails to appoint an arbitrator or umpire within one month of a request in writing by either of them to do so, such arbitrator or umpire, as the case may be, shall at the request of either Party be appointed by a Judge of the Superior Court of the North Carolina General Court of Justice or a Judge of the U. S. District Court for the Middle District of North Carolina.

15.2 The arbitration proceeding shall take place in Chicago, Illinois. Each Party shall submit its case to the arbitrators within one (1) month after receipt of notice of the selection of the umpire unless the period is extended by the arbitrators or by agreement of the Parties. The arbitrators and umpire are relieved from all judicial formality and may abstain from following the strict rules of law. They shall settle any dispute under the Agreement according to an equitable rather than a strictly legal interpretation of its terms.

15.3 Each party shall bear the expenses of its arbitrator and shall jointly and equally share with the other the expenses of the umpire and of the arbitration.

15.4 This Article shall survive the termination of this Agreement.

16. General:

16.1 Errors and Omissions. Reinsurer shall not be relieved of liability by reason of an error or accidental omission by Ceding Company in reporting any Reinsurance Claim, provided that such error or omission is rectified promptly after discovery, and Reinsurer is

not materially prejudiced thereby. Reinsurer will not be liable for Reinsurance Claims resulting from dishonesty or fraud on the part of Ceding Company's employees, agents or representatives.

16.2 Amendments. This Agreement may be amended only with the written consent of both Parties; provided, however, that no amendment to this Agreement shall be effective until approved by the Commissioner and further provided that the Parties hereby consent to any amendment required or ordered by the Commissioner. If Reinsurer objects to any amendment required or ordered by the Commissioner, then Reinsurer shall have the right to terminate this Agreement, after the date the Commissioner requests or orders such amendment, upon thirty (30) days notice.

16.3 Applicable Law. This Agreement, and future amendments hereto, shall be subject to and construed in accordance with the substantive laws of the state of Illinois. Any arbitration under this Agreement or any dispute concerning the right to arbitration shall be governed by the Federal Arbitration Act (9 U.S.A. Section I et seq.) and not by the laws of the state of Illinois.

16.4 Notices and Reports. Except as otherwise specifically set forth herein, all notices and reports to be given by a party shall be in writing and shall be sufficiently given if sent by first class certified mail, return receipt requested, by an overnight delivery service or by confirmed telecopy to the parties at the addresses set forth below:

If to Reinsurer, to:

AAMBG Reinsurance, Inc.
C/o Standard Federal Bank
2600 West Big Beaver Road
Troy, Michigan 48084
Attn: Stewart W. Fleming, Vice President
Telecopier Number: (248) 643-0329    Phone # 248-341-0000

With a copy to:

Johnson & Higgins Services, Inc,
7 Burlington Square, 6th Floor
Burlington, VT 05401
Attention: Kathryn M. Boucher
Telecopier Number: (802) 864-5764

If to Ceding Company, to:

Triad Guaranty Insurance Corporation
101 South Stratford Road, Suite 500
Winston-Salem, NC 27104
Telecopier Number: (336) 723-2824
Attn: Executive Vice President-Operations (with a copy to the General Counsel at the same address)

Either party may from time to time by notice as provided in this Section designate a different address to which such notices shall be sent.

16.7 Exercise of Rights. The failure or refusal by either Party to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof and no verbal communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in writing and signed by the Party against whom such waiver is asserted, plainly expressing an intent to waive such rights.

16.8 No Publicity. No Party shall use the other Party's name or describe its role as Reinsurer or Ceding Company, as the case may be, in any publicity releases by one Party without the other Party's written consent.

16.9 Successors and Assigns. This Agreement shall inure to the benefit of, and shall bind, the successors and assigns of the Parties.

16.10 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

16.11 Titles. Titles used for Sections are for convenience of reference only and are not part of the terms and conditions of this Agreement.

16.12 Offset. Each Party hereto shall have, and may exercise at any time and from time to time, the right to offset any undisputed balance or balances, whether on account of Reinsurance Premiums or on account of Losses or otherwise, due to such Party from the other (or, if more than one, any other) Party hereto under this Agreement; provided, however, that, in the event of the insolvency of a Party hereto, offset shall only be allowed in accordance with the provisions of Section 7427 of the Insurance Law of the State of New York, as it may be amended from time to time.

16.13 Confidentiality. The Parties hereby acknowledge that certain information exchanged by them pursuant to this Agreement is confidential, sensitive, or proprietary in nature. A Party may designate such information as "Confidential" by written notice to the other Party at the time of initial disclosure of such information. Each Party agrees that such "Confidential" information shall be used solely for the purpose of ceding or assuming reinsurance under the terms and conditions of this Agreement and shall be disclosed only to employees, agents, and representatives of the Party as is necessary for the performance of that Party's obligations under this Agreement. Such employees, agents, and representatives shall use reasonable safeguards to maintain the confidentiality of such information and to prevent its disclosure to any person not authorized to receive such information.

16.14 <u>Entire Agreement</u>. No representations or statements of any kind made by either party which are not expressly stated herein or in any written amendment hereto shall be binding on such party. This Agreement, including any Schedules or other attachments, and the related Trust Agreement constitute the entire agreement between Ceding Company and Reinsurer with respect to the subject matter hereof, and supersede all other agreements, proposals, and other communications between Ceding Company and Reinsurer relating to the subject matter hereof, whether oral or written. No other oral or written agreement or contract relating to the risks reinsured hereunder currently exist and/or are contemplated between the parties.

IN WITNESS WHEREOF, this Agreement has been duly executed in duplicate original counterparts by the Parties.

Reinsurer:                                          Ceding Company:

AAMBG REINSURANCE, INC.                              TRIAD GUARANTY INSURANCE
                                                     CORPORATION

By (Signature): _____                    By (Signature): _____

Name (Printed):  Stewart W. Fleming                  Name (Printed):  Ron O. Kessinger

Title:  President                                    Title:  Exec V.P

Attest (Signature): _____                Attest (Signature):  Earl F. Wall

Name (Printed):  Sally A. Koehler                    Name (Printed):  Earl F. Wall

16.

## SCHEDULE A

As an inducement for Ceding Company to enter into this Agreement, each Approved Originator identified below agrees that it will give or cause to be given to each borrower whose loan is or may be subject to this Agreement a disclosure as appropriate regulatory authorities may suggest or require. Such disclosure will be mutually agreeable to Ceding Company and Approved Originator.

Approved Originators

Company Name: Standard Federal Bank

By (Signature): _____

Name (Printed): Stewart W. Fleming

Title: _____


Company Name: ABN AMRO Mortgage Group, Inc.

By (Signature): _____

Name (Printed): Stewart W. Fleming

Title: _____


Company Name: LaSalle Home Mortgage Corp.

By (Signature): _____

Name (Printed): Stewart W. Fleming

Title: _____

17.

# TRIAD GUARANTY INSURANCE CORPORATION
# TRUST AGREEMENT NO. A-10

THIS AGREEMENT (the "Trust Agreement") made as of _June 5_ 1999, by and among **AAMBG REINSURANCE, INC.,** (the "Grantor"), a Vermont insurance company, **TRIAD GUARANTY INSURANCE CORPORATION,** (the "Beneficiary"), an Illinois insurance company, and _Branch Banking & Trust Co._, a _North Carolina Company_ (the "Trustee "):

## WITNESSETH

WHEREAS Grantor and Beneficiary have entered into a Reinsurance Agreement, defined below, whereby Grantor, as reinsurer, has agreed to indemnify Beneficiary, as cedent, against loss under policies of mortgage guaranty insurance; and

WHEREAS Grantor and Beneficiary desire to create a trust account, qualified as such under state laws and regulations allowing reduction from liability for reinsurance ceded to a non-licensed assuming mortgage guaranty insurer, to hold assets as security for the performance by Grantor of its Obligations (as defined below) under the Reinsurance Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

## 1 DEFINITIONS

**1.1 Beneficiary:** Beneficiary shall mean, in addition to the party named above, any successor of Beneficiary by operation of law, including, without limitation, any liquidator, rehabilitator, receiver, or conservator.

**1.2 Obligations:** Obligations shall mean reinsured losses and allocated loss adjustment expenses paid by Beneficiary, but not recovered from Grantor, and all other sums due from the Grantor under the Reinsurance Agreement.

**1.3 Reinsurance Agreement:** Reinsurance Agreement shall mean that reinsurance agreement by and between Beneficiary, as cedent, and Grantor, as reinsurer, a copy of which is attached to this Trust Agreement and made a part hereof. Capitalized terms used in this Trust Agreement, but not defined herein, shall have the meanings ascribed thereto in the Reinsurance Agreement.

## 2 FUNDING

To support Grantor's Obligations, Grantor shall fund

(a) the capital fund portion of the Trust Account, defined below, shall be funded as set forth in Section 13.2 of the Reinsurance Agreement, and

(b) the reserve fund portion of the Trust Account, defined below, shall be funded as set forth in Section 13.3 of the Reinsurance Agreement.

1



# 3 PROVISIONS RELATING TO THE TRUST ACCOUNT

**3.1 Establishment of Trust Account:** Grantor hereby establishes a trust account (the "Trust Account") with Trustee for the sole use and benefit of Beneficiary, upon the terms and conditions hereinafter set forth. This Trust Account vests legal title to all trusteed assets in the Trustee for the Grantor and its United States' policyholders and their assigns and successors in interest. This Trust Account shall remain in effect for so long as Grantor has outstanding Obligations due under the Reinsurance Agreement.

**3.2 Trusteed Assets:** Trustee and its lawfully appointed successors is and are authorized and shall have power to receive such securities and other property as Grantor from time to time may transfer or remit to or vest in said Trustee or place in such Trustee's hands or under said Trustee's control, and to hold, invest, reinvest, manage and dispose of the same for the uses and purposes and in the manner and according to the provisions hereinafter set forth. All such trusteed assets at all times shall be maintained as a trust account, separate and distinct from all other assets, and shall be continuously kept within the United States.

**3.3 Authorized Investments:** Assets deposited in the Trust Account by Grantor and investments and reinvestments thereof shall consist only of currency of the United States, certificates of deposit issued by a United States bank and payable in currency of the United States and government obligations, corporate obligations, preferred or guaranteed stocks, common stock and other assets or investments of the types listed by the Securities Valuation Office of the National Association of Insurance Commissioners and qualified as admitted assets and also permitted under the provisions of Illinois Insurance Law, provided that such investments are issued by an institution that is not the parent, subsidiary or affiliate of either Grantor or Beneficiary ("Authorized Investments"). Any deposit or investment direction by Grantor shall constitute a certification by Grantor to Trustee that the assets so deposited or to be purchased pursuant to such investment direction are Authorized Investments and Trustee shall be entitled to rely on Beneficiary's representations that any assets so deposited or purchased pursuant to Grantor's direction with the Beneficiary's instruction and consent are Authorized Investments.

**3.4 Negotiability of Assets:** Grantor shall, upon execution of this Agreement, and from time to time thereafter as required, execute assignments or endorsements in blank of all securities or other property standing in Grantor's name which are delivered to Trustee to form a part of the Trust Account so that, whenever necessary, Trustee can negotiate any such asset without the consent or signature of Grantor or any person or entity; any assets received by Trustee which are not in such properly negotiable form shall not be accepted by Trustee and shall be returned to Grantor as unacceptable. In addition, Trustee may hold assets of the Trust Account in bearer form or in its own name or that of a nominee.

**3.5 Substitution of Assets:** Assets in the Trust Account may be substituted by Grantor only if consented to in writing by Beneficiary, and such consent shall not be unreasonably withheld. If Grantor is so permitted to substitute Authorized Investments for any assets forming part of the Trust Account, the then current market value of the Authorized Investments so substituted shall not be less than the then current market value of the

assets withdrawn; provided, however, that Trustee shall be protected in relying upon any statement of Beneficiary as to the current market value of any assets so withdrawn or substituted.

**3.6 Investing and Reinvesting the Assets:** The responsibility for directing Trustee to invest and reinvest the assets in the Trust Account shall be that of Grantor and, unless and until directed by Grantor, Trustee shall not be required to take any action with respect to the investment or reinvestment of the Trust Account's assets. Trustee shall invest and reinvest the Trust Account, or any part thereof, in such Authorized Investments as Grantor shall direct in writing.

**3.7 Income From Investment of Assets:** All dividends, interest and other income resulting from the investment of the assets in the Trust Account shall be the property of Grantor. To the extent that Trustee shall collect and receive such income from the Trust Account, it shall pay over the amount of such income, no more frequently than monthly, upon the written direction of Grantor; provided, however, that Trustee shall have no obligation with respect to the collection of such income.

**3.8 Withdrawal of Assets:** Beneficiary agrees and covenants that it shall only withdraw the assets of the Trust Account to satisfy amounts due, without diminution because of the insolvency of Beneficiary or Grantor, for the following purposes only:

    (a) to pay or reimburse Beneficiary for Grantor's share under the Reinsurance Agreement of any reinsured losses and allocated loss adjustment expenses paid by Beneficiary, but not recovered from Grantor, and all other sums due from the Grantor under the Reinsurance Agreement;

    (b) either (i) after five (5) years following the end of each Policy Year, to make payment to Grantor of any amounts held in the Trust Account with respect to that Policy Year that exceed 110 percent of the actual amount required under Section 2 of this Trust Agreement or (ii) to make payment to Grantor of any amounts held in the Trust Account that exceed a Capital Ratio of twenty-five percent (25%) ; and/or

    (c) where Beneficiary received notification of termination of the Trust Account and where Grantor's entire Obligations under the Reinsurance Agreement remain unliquidated and discharged ten (10) days prior to such termination date, to withdraw amounts equal to such Obligations and deposit such amounts in a separate account in the name of Beneficiary in any United States bank or trust company, apart from its general assets, in trust for such uses and purposes specified in Section 3.8(a) above as may remain executory after such withdrawal and for any period after such termination date.

Any contested claim shall be valid and enforceable upon the final order of any court of competent jurisdiction in the United States.

**3.9 Proprietary Rights:** Grantor shall have the full unqualified right to vote and execute consents and to exercise any and all proprietary rights not inconsistent with this Trust

Agreement with respect to any securities or other property forming a part of the Trust Account.

**3.10 Withdrawals:** Withdrawals from the Trust Account may be made by Beneficiary at any time and from time to time, without notice to Grantor, subject only to written notice from Beneficiary to Trustee. No other statement or document need be presented by Beneficiary in order to withdraw assets, except that Beneficiary shall be required by Trustee to acknowledge receipt of withdrawn assets. Upon receipt of Beneficiary's instructions, Trustee shall immediately take any and all necessary steps to transfer absolutely and unequivocally to Beneficiary all right, title and interest in the assets being withdrawn, and to deliver the physical custody thereof to Beneficiary. Trustee shall be protected in relying upon any written demand of Beneficiary for such withdrawal.

**3.11 Accounting and Notice**

(a) Trustee shall furnish to Grantor and Beneficiary an accounting of all assets in the Trust Account upon its inception and thereafter at intervals no less frequent than as of the end of each calendar quarter. Such accountings shall be given as soon as practicable, but in no event later than fifteen (15) days after such date.

(b) Trustee shall furnish to Grantor and Beneficiary notice of any deposits to or withdrawals from the Trust Account within ten (10) calendar days of the occurrence of such event.

## 4 PROVISIONS RELATING TO TRUSTEE

**4.1 Basic Requirements:** Trustee shall be a bank or trust company organized and existing under the laws of the State of Illinois or shall be a member of the Federal Reserve System of the United States. Trustee shall not be the parent, subsidiary or affiliate or either Grantor or Beneficiary.

**4.2 Compensation for Trustee:** Trustee shall be entitled to receive as compensation for its services hereunder an annual fee, computed and payable quarterly, at such rate as may be agreed from time to time in writing between Grantor and Trustee. Grantor shall be solely responsible for the payment of the fee of Trustee and all reasonable expenses of Trustee, including reasonable fees of counsel. The Trust Account shall not be utilized for the payment of such fees and expenses.

**4.3 Safekeeping and Administration of the Trust Account:** Trustee shall be liable for the safekeeping and administration of the Trust Account in accordance with the provisions of this Trust Agreement. Trustee is specifically authorized to hold assets of the Trust Account in its own vault, at the Federal Reserve, or at any depository in the United States as the Trustee, in its sole discretion, may choose. Trustee shall not be liable nor responsible for any loss to the Trust Account unless such loss shall be caused by its own negligence, wilful misconduct or lack of good faith.

**4.4 Protection of Trustee:** Subject to the obligation of Section 4.3 (Safekeeping and Administration of the Trust Account), Trustee shall be protected in acting upon any

statement, notice, resolution, request, consent, order, certificate, report, appraisal, opinion, telegram, cablegram, radiogram, letter or other paper or document believed by Trustee to be genuine and to have been signed, sent or presented by the proper party or parties. All notices to Trustee (unless otherwise provided therein) shall be deemed to be effective when received by Trustee.

**4.5 Liability of Trustee:** Without prejudice and in addition to any other provision of this Agreement, Trustee shall not be liable for anything which it may do or refrain from doing in connection herewith, except its own negligence or willful misconduct.

**4.6 Right of Set-off:** Trustee hereby waives any right of set-off and all other rights and remedies that Trustee may have against or affecting the Trust Account.

**4.7 Other Contract or Agreement:** Trustee is not a party to, and is not bound by, or charged with notice of, any contract or agreement out of which this Agreement may arise.

**4.8 Statements or Certificates of Grantor and Beneficiary:** Whenever in the administration of the Trust Account created by this Trust Agreement Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking, suffering or omitting any action thereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement or certificate signed by or on behalf of Grantor and/or Beneficiary and delivered to Trustee and said certificate shall be full warrant to Trustee for any action taken, suffered or omitted by it on the faith thereof; but in its discretion, Trustee may in lieu thereof accept other evidence of the fact or matter or may require such other or additional evidence as it may deem reasonable.

**4.9 Requirements for Execution:** Except when otherwise expressly provided in this Trust Agreement, any statement, certitude, notice, requests, consent, approval, or other instrument to be delivered or furnished by Grantor and/or Beneficiary shall be sufficiently executed if executed in the name of Grantor and/or Beneficiary by such officer or officers of Grantor and/or Beneficiary or by such other agent or agents of Grantor and/or Beneficiary as may be designated in a resolution or letter of advice by Grantor and/or Beneficiary. Written notice of such designation by Grantor and/or Beneficiary shall be filed with Trustee. Trustee shall be protected in acting upon any written statement or other instrument made by such officer or agent of Grantor and/or Beneficiary with respect to the authority conferred on him.

**4.10 Opinion of Counsel:** Trustee may consult with counsel selected by it who may be counsel for Grantor or Beneficiary. The opinion of said counsel shall be full and complete authority and protection of Trustee with respect to any action taken, suffered or omitted by it in good faith and in accordance with the opinion of said counsel other than with respect to the withdrawal of trust assets by Beneficiary.

**4.11 Records:** Trustee shall keep full and complete records of the administration of the Trust Account. Grantor and/or Beneficiary may examine such records at any time during business hours by any person or persons duly authorized in writing by Grantor and/or Beneficiary.

5

**4.12 Acceptance of Trust:** Trustee hereby accepts the trust herein created and declared upon the terms herein expressed.

**4.13 Resignation or Removal of Trustee:** Trustee may resign, by written resignation, effective not less than ninety (90) days after receipt hereof by Grantor and Beneficiary, and Grantor may remove Trustee at any time, without assigning any cause therefor, provided that no such resignation or removal shall be effective until a successor trustee has been appointed by Grantor and approved by Beneficiary and has accepted such appointment and all assets in the Trust Account have been duly transferred to such successor trustee or until the Trust Account has been terminated pursuant to Section 5.1 of this Trust Agreement. In case of the appointment of a successor trustee, all of the powers, right and duties of Trustee named herein shall survive and continue in the successor trustee and every successor trustee shall succeed to take and have all the estate, powers, rights and duties which belonged to or were held by its predecessor. In the case of the resignation or removal of a Trustee, the Trustee shall have the right to a final accounting with respect to the Trust Account.

## 5 MISCELLANEOUS PROVISIONS

**5.1 Termination:** This Trust Agreement shall be effective until terminated by sixty (60) days' advance written notice sent to Trustee by Grantor. Written notice of termination shall be delivered by Trustee to Beneficiary at least thirty (30) but not more than forty-five (45) days prior to termination. Upon the termination of this Trust Agreement, Trustee shall, with Beneficiary's written consent, transfer, pay over and deliver to Grantor all of the estates of the Trust Account less all its proper fees and expenses then owing in exchange for a written receipt from Grantor.

**5.2 Governing Law:** The provisions of and validity and construction of this Trust Agreement and any amendments thereto shall be governed by and construed in accordance with the laws of the State of Illinois, and the Trust Account created hereunder shall be administered in accordance with the laws of said State.

**5.3 Examinations:** The Trust Account and all records of the administration of the Trust Account may be examined by the Commissioner.

**5.4 Agent for Service of Process:** The Trust Account designates the Commissioner as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding.

**5.5 Amendments:** This Trust Agreement may be amended at any time by written agreement signed by Grantor and Beneficiary and delivered to Trustee; provided, however, that no such amendment shall be effective to increase the powers, rights or duties of Trustee without Trustee's written consent.

**5.6 Invalidity or Unenforceability:** If any provision of this Trust Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect the remaining parts of this Trust Agreement.

**5.7 Counterparts:** This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute but one and the same instrument, which shall be sufficiently evidenced by any one counterpart.

**5.8 Successors and Assigns:** This Trust Agreement shall be binding upon the successors and assigns of the parties hereto.

**5.9 No Conditions or Qualifications:** Except as stated herein, this Trust Agreement is not subject to any conditions or qualifications.

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement on the dates specified below.

AAMBG REINSURANCE, INC.,
Grantor

By (Signature): _____

Name (Printed): Stewart W. Fleming

Title: President

Date: May 18, 1999


TRIAD GUARANTY INSURANCE,
CORPORATION, Beneficiary

By (Signature): _____

Name (Printed): Ron O. Kessinger

Title: Exec. V.P

Date: 6/8/99


Branch Banking & Trust Co. , Trustee

By (Signature): _____

Name (Printed): Raymond I. Hand

Title: Vice President

Date: 6/8/99

## INSTRUMENT OF REPLACEMENT, APPOINTMENT AND ACCEPTANCE

This INSTRUMENT OF REPLACEMENT, APPOINTMENT AND ACCEPTANCE (this *"Instrument"*) among AAMBG Reinsurance Inc. (the *"Grantor"*), a Vermont insurance company, Triad Guaranty Insurance Corporation ( the *"Beneficiary"*), an Illinois insurance company, and U.S. Bank National Association (the *"Successor Trustee"*) is dated as of January 3l, 2010, and is effective as of the Effective Date defined below.

### RECITALS

The Grantor, the Beneficiary and Branch Banking & Trust Co. (the *"Predecessor Trustee"*), a North Carolina company, are parties to that certain Triad Guaranty Insurance Corporation Trust Agreement No. A-10,as previously amended (as amended, the *"Trust Agreement"*), dated as of June 8, 1999.

The Grantor wishes to replace the Predecessor Trustee under the Trust Agreement effective as of April 13, 2010 (the *"Effective Date"*); the Grantor wishes to appoint the Successor Trustee to succeed the Predecessor Trustee as Trustee under the Trust Agreement effective as of the Effective Date; and the Beneficiary wishes to consent to the appointment of the Successor Trustee as Trustee under the Trust Agreement effective as of the Effective Date.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein, the receipt and sufficiency of which are hereby acknowledged, the Grantor, the Beneficiary and the Predecessor Trustee agree as follows:

### ARTICLE ONE
### THE GRANTOR

Section 101. The Grantor hereby certifies that the Grantor is, and the officer of the Grantor who has executed this Instrument is, duly authorized to: (a) replace the Predecessor Trustee as Trustee under the Trust Agreement; (b) appoint the Successor Trustee as Trustee under the Trust Agreement; (c) execute and deliver such agreements and other instruments as may be necessary or desirable to effectuate the succession of the Successor Trustee as Trustee under the Trust Agreement.

Section 102. Pursuant to Section 4.13 of the Trust Agreement, the Grantor hereby removes the Predecessor Trustee as Trustee under the Trust Agreement effective as of the Effective Date.

Section 103. Pursuant to Section 4.13 of the Trust Agreement, the Grantor hereby appoints the Successor Trustee as Trustee under the Trust Agreement and confirms to the Successor Trustee all the liabilities, rights, powers, privileges and duties of the Predecessor Trustee under the Trust Agreement and with respect to all property and money held by such Predecessor Trustee under the Trust Agreement, including without limitation the Trust Account, with like effect as if the Successor Trustee was originally named as Trustee under the Trust Agreement. The Grantor shall execute and deliver such further instruments and shall do such other things as the Successor Trustee may reasonably require so as to more fully and certainly vest and confirm in

the Successor Trustee all the liabilities, rights, powers, privileges and duties hereby assigned, transferred, delivered and confirmed to the Successor Trustee.

Section 104. The Grantor hereby represents and warrants to the Successor Trustee that:

(a) No covenant or condition contained in the Trust Agreement has been waived by the Grantor.

(b) The Trust Agreement has not been amended or modified and is in full force and effect.

(c) There is no action, suit or proceeding pending or, to the best of the Grantor's knowledge, threatened against the Grantor before any court or any governmental authority arising out of any action or omission by the Grantor under the Trust Agreement.

(d) This Instrument has been duly authorized, executed and delivered on behalf of the Grantor and constitutes its legal, valid and binding obligation.

(e) All conditions precedent relating to the appointment of the Successor Trustee as Successor Trustee under the Trust Agreement have been complied with by the Grantor.

Section 105. The Grantor agrees to cause the Predecessor Trustee to assign, transfer, deliver and confirm to the Successor Trustee all right, title and interest of the Predecessor Trustee in and to the trust under the Trust Agreement effective as of the Effective Date, and all property and money held by such Predecessor Trustee under the Trust Agreement effective as of the Effective Date, including without limitation the Trust Account, with like effect as if the Successor Trustee was originally named as Trustee under the Trust Agreement. The Grantor agrees to use its best efforts to cause the Predecessor Trustee to execute and deliver such further instruments and to do such other things as the Successor Trustee may reasonably require so as to more fully and certainly vest and confirm in the Successor Trustee all the liabilities, rights, powers, privileges and duties hereby assigned, transferred, delivered and confirmed to the Successor Trustee.

Section 106. On or prior to the Effective Date, the Grantor shall deliver to the Successor Trustee the items listed on Exhibit A annexed hereto.

ARTICLE TWO
THE SUCCESSOR TRUSTEE

Section 201. The Successor Trustee hereby represents and warrants to the Predecessor Trustee, the Grantor and the Beneficiary that:

(a) The Successor Trustee is eligible under the provisions of Section 4.1 of the Trust Agreement to act as Trustee under the Trust Agreement.

2

WHD/6910656.1

(b)     This Instrument has been duly authorized, executed and delivered on behalf of the Successor Trustee.

Section 202. The Successor Trustee hereby accepts its appointment as Trustee under the Trust Agreement and shall hereby be vested with all the liabilities, rights, powers, privileges and duties of the Predecessor Trustee under the Trust Agreement and with respect to all property and money held or to be held under the Trust Agreement, including without limitation the Trust Account, with like effect as if the Successor Trustee was originally named as Trustee under the Trust Agreement.

## ARTICLE THREE
## THE BENEFICIARY

Section 301. The Beneficiary hereby consents to and approves the replacement of the Predecessor Trustee and the appointment of the Successor Trustee as successor trustee under the Trust Agreement.

## ARTICLE FOUR
## MISCELLANEOUS

Section 401. Except as otherwise expressly provided or unless the context otherwise requires, all capitalized terms used herein which are defined in the Trust Agreement shall have the meanings assigned to them in the Trust Agreement.

Section 402. This Instrument and the replacement, appointment and acceptance effected hereby shall be effective as of the opening of business on the Effective Date.

Section 403. Notwithstanding the replacement of the Predecessor Trustee effected hereby, the Grantor shall remain obligated under Section 4.2 of the Trust Agreement to compensate the Predecessor Trustee in connection with its prior trusteeship under the Trust Agreement. The Grantor also acknowledges and reaffirms its obligations to the Successor Trustee as set forth in Section 4.2 of the Trust Agreement, which obligations shall survive the execution hereof.

Section 404. This Instrument shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to the conflict of law provisions thereof to the extent the law of another jurisdiction would apply.

Section 405. This Instrument may be executed in any number of counterparts each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

Section 406. Delivery of a counterpart hereof, or a signature page hereto, by facsimile or in a .pdf or similar file shall be effective as delivery of a manually executed original counterpart thereof.

3

WHD/6910656.1

Section 407. All notices will be deemed received when sent pursuant to the following instructions:

TO THE SUCCESSOR TRUSTEE:

U.S. Bank National Association
Corporate Trust Services
1555 North RiverCenter Drive, Suite 203
Milwaukee, WI 53212
ATTN: Peter Brennan

TO THE GRANTOR:

AAMBG Reinsurance Inc.
C/o Standard Federal Bank
2600 West Big Beaver Road
Troy, Michigan 48084

TO THE BENEFICIARY:

Triad Guaranty Insurance Corporation
Attn: Earl Wall
101 South Stratford Road
Winston-Salem, NC 27104

[Remainder of Page Intentionally Blank]

4

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed and attested by their duly authorized officers, all as of the date and year first above written.

AAMBG REINSURANCE INC., as Grantor

By: _____
Name: George V. Hanan, II
Title: President

U. S. BANK NATIONAL ASSOCIATION, as Successor Trustee

By: _____
Name: Peter M. Brennan
Title: Vice President

TRIAD GUARANTY INSURANCE CORPORATION, as Beneficiary

By: _____
Name: Shirley Groff
Title: Sr. Vice President

[Signature Page of Instrument of Replacement, Appointment and Acceptance]

VFIED/49404656.3

## EXHIBIT A

Documents to be delivered to the Successor Trustee:

 1.   Executed copy of the Trust Agreement.

 2.   File of Closing Documents.

 3.   Trust Account statements for a one year period preceding the date of this Instrument.

 4.   Such other documents as the Successor Trustee may require in order to transfer the appointment to it.

A-1

# WIRE INSTRUCTIONS

US BANK
ABA 075000022
Corporate Trust
A/C 112-950-027
BNF: AAMBG/TRIAD
AC#. 136226000
ATTN P. BRENNAN

# EXHIBIT 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT CHANCERY DIVISION

PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*,
ACTING DIRECTOR OF INSURANCE, ANNE
MELISSA DOWLING,

    Plaintiffs,

              v.                     Case No. 12 CH 43895

TRIAD GUARANTY INSURANCE CORPORATION,
an Illinois domestic stock insurance company, and
TRIAD GUARANTY ASSURANCE CORPORATION,
an Illinois domestic stock insurance company,

    Defendants.

## NOTICE AND ACKNOWLEDGMENT OF
## RECEIPT OF SUMMONS AND COMPLAINT

To:   **AAMBG**
      **c/o Mary Lakey**
      **Senior Vice President**
      **CitiMortgage, Inc.**
      **1000 Technology Drive**
      **O'Fallon, Missouri 63368**

       The enclosed summons and complaint are served pursuant to 735 ILCS 5/2-213 of the Illinois Code of Civil Procedure on June 17, 2016.

       You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within three (3) days.

       You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

       If you do not complete and return the form to the sender within three (3) days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

       If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within sixty (60) days of June 17, 2016. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

1

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons complaint will have been mailed on June 17, 2016.

## ACKNOWLEDGMENT OF RECEIPT OF COMPLAINT FOR INJUNCTIVE RELIEF AND WAIVER OF SERVICE OF SUMMONS

I declare, under penalty of perjury, that I received a copy of the People of the State of Illinois, *ex rel.*, Acting Director Insurance, Anne Melissa Dowling ("Rehabilitator") Complaint for Injunctive Relief in the above-captioned matter in my capacity for AAMBG, and that service of summons is waived on their behalf.

Name: Thomas V. Panoff
_____
Printed or Typed

Mayer Brown LLP
Address: 71 South Wacker Drive
_____

City/State/Zip: Chicago, IL 60606
_____

Relationship to Defendant/Authority to Receive

Service of Process: Attorney for AAMBG
_____

Dated: July 20, 2016
_____

Signature: *Th V Pall*
_____

Service Attestation From:    Dominick L. Lanzito
Peterson, Johnson & Murray – Chicago, LLC
200 W. Adams, Suite 200
Chicago, Illinois 60606
(312) 782-7150

I, Dominick L. Lanzito, an attorney at law, declare under penalties of perjury that two copies of this Notice and Acknowledgement of Receipt of Complaint for Injunctive Relief and Waiver of Service of Summons, have been mailed to AAMBG, c/o Mary Lakey, on June 17, 2016.

Dated: June 17, 2016                              Signature:    s/Dominick L. Lanzito
_____                                     _____

Dominick L. Lanzito
PETERSON, JOHNSON & MURRAY CHICAGO, LLC
200 W. Adams, Suite 2125
Chicago, Illinois 60606
(312) 782-7150
dlanzito@pjmlaw.com

2

# EXHIBIT 3

| | |
|---|---|
| 2120 - Served | |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| **SUMMONS** | **ALIAS - SUMMONS** |

(2/28/11) CCG N001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, <u>CHANCERY</u> DIVISION

No. <u>12 CH 43895</u>

PEOPLE OF THE STATE OF ILLINOIS, et.al.

**(Name all parties)**

v.

TRIAD GUARANTY INSURANCE CORP, et.al.

### ◉ SUMMONS ○ ALIAS SUMMONS

**To each Defendant:**

    **YOU ARE SUMMONED** and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

- ◉ **Richard J. Daley Center, 50 W. Washington, Room** <u>802</u> **, Chicago, Illinois 60602**

| | | |
|---|---|---|
| ○ **District 2 - Skokie**<br>5600 Old Orchard Rd.<br>Skokie, IL 60077 | ○ **District 3 - Rolling Meadows**<br>2121 Euclid<br>Rolling Meadows, IL 60008 | ○ **District 4 - Maywood**<br>1500 Maybrook Ave.<br>Maywood, IL 60153 |
| ○ **District 5 - Bridgeview**<br>10220 S. 76th Ave.<br>Bridgeview, IL 60455 | ○ **District 6 - Markham**<br>16501 S. Kedzie Pkwy.<br>Markham, IL 60428 | ○ **Child Support**<br>28 North Clark St., Room 200<br>Chicago, Illinois 60602 |

**You must file within 30 days after service of this Summons, not counting the day of service.**
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

    **This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.**

Atty. No.: <u>42316</u>

Name: <u>Dominick L. Lanzito</u>

Atty. for: <u>Plaintiffs</u>

Address: <u>200 W. Adams, Suite</u>

City/State/Zip: <u>Chicago, IL 60606</u>

Telephone: <u>(312) 782-7150</u>

WITNESS, _____, _____

_____
**Clerk of Court**

Date of service: _____, _____
    **(To be inserted by officer on copy left with defendant or other person)**

Service by Facsimile Transmission will be accepted at: <u>(312) 896-9318</u>

               **(Area Code)**    **(Facsimile Telephone Number)**

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# EXHIBIT 4

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*, ANDREW BORON, DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 12 CH 43895 |
| v. | ) ) ) | Honorable Rodolfo Garcia |
| TRIAD GUARANTY INSURANCE CORPORATION, an Illinois domestic stock insurance company, and TRIAD GUARANTY ASSURANCE CORPORATION, an Illinois domestic stock insurance company, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*, ANNE MELISSA DOWLING, ACTING DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, as Rehabilitator for TRIAD GUARANTY INSURANCE CORPORATION and TRIAD GUARANTY ASSURANCE CORPORATION, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| AAMBG REINSURANCE, INC., a Vermont corporation, | ) ) ) | |
| Defendant. | ) ) | |

## NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT on July 22, 2016, a Notice of Removal was filed removing the Complaint at Law and for Injunctive Relief ("Complaint") filed on or around June 17, 2016 by counsel for the People of the State of Illinois, *ex rel.*, Anne Melissa Dowling, Acting

1

Director of Insurance of the State of Illinois, as Rehabilitator for Triad Guaranty Insurance Corporation and Triad Guaranty Assurance Corporation (the "Director as Rehabilitator for the Triad Companies"), against AAMBG Reinsurance, Inc. to the United States District Court for the Northern District of Illinois. Copies of all process, pleadings, and orders that relate to the proceeding initiated with the filing and service of the Complaint on AAMBG Reinsurance Inc. and that were served on AAMBG Reinsurance, Inc. have been attached to the Notice of Removal. The Notice of Removal and all exhibits are attached hereto. Only the underlying action involving AAMBG Reinsurance, Inc. as a defendant has been removed, not all proceedings under the caption number 12-CH-43895. Counsel for the Director as Rehabilitator for the Triad Companies received notice of the Notice of Removal pursuant to 28 U.S.C. § 1446. A copy of the Notice of Removal to All Adverse Parties is attached hereto.

Dated: July 22, 2016

RESPECTFULLY SUBMITTED,

By _____

Lucia Nale
Thomas V. Panoff
Joseph M. Callaghan
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
lnale@mayerbrown.com
tpanoff@mayerbrown.com
jcallaghan@mayerbrown.com

2

David M. Souders
(*pro hac vice* motion forthcoming)
WEINER BRODSKY KIDER PC
1300 19th Street, N.W., Fifth Floor
Washington, D.C. 20036
Telephone:  (202) 628-2000
Facsimile:  (202) 628-2011
souders@thewbkfirm.com

*Counsel for Defendant AAMBG
Reinsurance, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 22, 2016, a true and correct copy of the foregoing

**NOTICE OF FILING OF NOTICE OF REMOVAL** was served on the following counsel of

record at the address indicated below by first-class U.S. Mail:

Dominick L. Lanzito
PETERSON, JOHNSON & MURRAY
200 W. Adams, Suite 2125
Chicago, IL 60606


Joseph M. Callaghan

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*, ANNE MELISSA DOWLING, ACTING DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, as Rehabilitator for TRIAD GUARANTY INSURANCE CORPORATION and TRIAD GUARANTY ASSURANCE CORPORATION, | ) ) ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | Honorable _____ |
| AAMBG REINSURANCE, INC., a Vermont corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

**<u>NOTICE OF REMOVAL TO ALL ADVERSE PARTIES</u>**

PLEASE TAKE NOTICE THAT on July 22, 2016, the attached Notice of Removal was filed removing this case to the United States District Court for the Northern District of Illinois. A true and correct copy of the Notice of Removal and all exhibits are attached hereto. This notice is served upon all counsel of record for Plaintiffs pursuant to 28 U.S.C. § 1446.

Dated: July 22, 2016

RESPECTFULLY SUBMITTED,

By  /s/ Thomas V. Panoff
       Lucia Nale
       Thomas V. Panoff
       Joseph M. Callaghan
       MAYER BROWN LLP
       71 South Wacker Drive
       Chicago, Illinois  60606-4637
       Telephone: (312) 782-0600
       Facsimile:  (312) 701-7711
       lnale@mayerbrown.com
       tpanoff@mayerbrown.com
       jcallaghan@mayerbrown.com

David M. Souders
(*pro hac vice* motion forthcoming)
WEINER BRODSKY KIDER PC
1300 19th Street, N.W., Fifth Floor
Washington, D.C. 20036
Telephone:  (202) 628-2000
Facsimile:  (202) 628-2011
souders@thewbkfirm.com

*Counsel for Defendant AAMBG*
*Reinsurance, Inc.*

2

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 22, 2016, a true and correct copy of the foregoing

**NOTICE OF REMOVAL TO ALL ADVERSE PARTIES** was electronically filed with the

Clerk of the Court of the United States District Court for the Northern District of Illinois using

the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of

record, and that the foregoing also was sent via first-class U.S. Mail to:

Dominick L. Lanzito
PETERSON, JOHNSON & MURRAY
200 W. Adams, Suite 2125
Chicago, IL 60606

/s/ Joseph M. Callaghan
Joseph M. Callaghan

721161627